IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

| STATE OF IOWA, et al., | ) | |
|---|---|---|
| *Petitioners*, | ) | |
| v. | ) | No. 24-1721 |
| JENNIFER GRANHOLM, in her official capacity as Secretary of the United States Department of Energy, et al., | ) | |
| *Respondents.* | ) | |

## MOTION OF ALLIANCE FOR AUTOMOTIVE INNOVATION FOR LEAVE TO INTERVENE IN SUPPORT OF RESPONDENTS

Pursuant to Federal Rule of Appellate Procedure 15(d), the Alliance for Automotive Innovation ("Auto Innovators") respectfully moves for leave to intervene in the above-captioned proceeding.

**I.     Introduction**

The Petition for Review challenges a regulation adopted by the U.S. Department of Energy ("DOE") on March 29, 2024 ("DOE's Final Rule" or the "Final Rule").[1] Adopted under authority granted to DOE in the federal motor vehicle fuel economy law, the Final Rule applies to the new motor vehicles manufactured by Auto Innovators' member companies. By seeking to invalidate DOE's Final Rule,

---

[1] 89 Fed. Reg. 22,041.

Petitioners would limit the auto industry's flexibility in attempting to comply with federal fuel economy standards. Auto Innovators moves to intervene in order to protect its members' interest in maintaining the flexibility permitted by the Final Rule.

## A. Statutory Background

The Energy Policy and Conservation Act of 1975 ("EPCA") established a national program to regulate automotive fuel economy.[2] Under authority delegated by the Secretary of Transportation, the National Highway Traffic Safety Administration ("NHTSA") establishes Corporate Average Fuel Economy ("CAFE") standards applicable to new automobiles powered by gasoline or other liquid fuels. When auto manufacturers fall short of those standards, NHTSA enforces those CAFE standards by imposing civil penalties.[3]

A 1979 amendment to EPCA directed DOE to establish by rule a method to determine the petroleum-equivalent energy consumption of electric vehicles powered from the electric grid.[4] Under the 1979 EPCA amendment, DOE sets what it calls the Petroleum Equivalency Factor (or "PEF"), based on DOE's assessment

---

[2] Pub. L. No. 94-163, § 301, 89 Stat. 871, 901 (1975); *see* 49 U.S.C. §§ 32901-32919.

[3] *See* 49 U.S.C. §§ 32902 (Transportation Secretary to set standards), 32911-32912 (civil penalties for noncompliance); 49 C.F.R. § 1.95(a) (Transportation Secretary's delegation of authority to NHTSA).

[4] Pub. L. No. 96-185, 93 Stat. 1324, 1336 (1980); *see* 49 U.S.C. § 32904(a)(2)(B).

2

of the energy efficiency of those electric vehicles, compared with vehicles powered by internal combustion engines. The PEF regulation permits inclusion of grid-powered electric vehicles in calculating the CAFE levels achieved by manufacturers who produce and sell grid-powered electric vehicles.[5]

The sponsors of the 1979 EPCA amendment expected that in setting a PEF, DOE would give due credit to the benefits of electric vehicles in reducing the nation's reliance on petroleum. They sought to incentivize major investment by the auto industry in electric vehicle technology and to provide flexibility to auto manufacturers in complying with the CAFE standards through the sale of electric vehicles.[6] Accordingly, the 1979 amendment to EPCA included a requirement that DOE base the PEF in part on "the need of the United States to conserve all forms of

---

[5] *See* 49 U.S.C. § 32904(a)(2)(B); 10 C.F.R. §§ 474.1-474.5. To be clear: not all "electric vehicle" technologies are designed to draw electricity from the power grid. Many have relied on gasoline-fueled engines to generate electricity for electric motors. Such non-plug-in "hybrid-electric" vehicles were the initial, transformational models of the Honda Insight and Toyota Prius.

[6] The lead sponsor of the 1979 EPCA amendment in the Senate explained the amendment and its intended effects as follows:

> This legislation will require the Secretary of Energy to develop a methodology for calculating an equivalent petroleum based fuel economy value for electric vehicles (a discussion of the methodological approach is appended to this statement). By allowing manufacturers to include "high fuel economy" valued electric vehicles, a manufacturer can probably sell more higher profit conventional vehicles. This additional profit should act as an incentive to provide the risk capital for electric vehicle production.

125 Cong. Rec. 4664 (Mar. 12, 1979) (remarks of Sen. McClure).

3

energy and the relative scarcity and value to the United States of all fuel used to generate electricity."[7] By 1979, it was apparent that the nation's sources of energy to produce electricity were more abundant that its sources of petroleum.

### B. DOE's Interpretation of EPCA in the Final Rule

Prior to 2024, the PEF regulation had last been revised by DOE in 2000. Giving what it considered full effect to the intent of the 1979 EPCA amendment, DOE decided in 2000 to include within the PEF a feature it called the "Fuel Content Factor." As DOE explained, the Fuel Content Factor would "result in a very substantial adjustment to the raw calculated energy efficiency of electric vehicles," in order "to reward electric vehicles' benefits to the Nation relative to petroleum-fueled vehicles." 65 Fed. Reg. 36,986, 36,988 (June 12, 2000).

In 2021, two environmental advocacy groups petitioned DOE to amend the 2000 PEF regulation in order to eliminate the Fuel Content Factor (among other proposed changes).[8] In April 2023, DOE proposed to eliminate the Fuel Content Factor from the PEF in model year ("MY") 2027. DOE explained that "[w]hile the reasons for including the [fuel content] factor in the 2000 Final Rule may have been compelling at that time, DOE believes they no longer justify inclusion of the fuel-

---

[7] 49 U.S.C. § 32904(a)(2)(B)(iii).

[8] *See* 86 Fed. Reg. 73,992 (Dec. 29, 2021) (publishing text of petition to amend the PEF regulation).

4

content factor because of current EV technology and market penetration." 88 Fed. Reg. 21,525, 21,534 (Apr. 11, 2023).

Numerous vehicle manufacturers and Auto Innovators commented on DOE's proposal to eliminate the Fuel Content Factor in MY 2027. One manufacturer asserted that "[t]he PEF has been an example of stable, consistent regulatory policy that has for over two decades provided manufacturers with certainty."[9] Elimination of the Fuel Content Factor, according to that manufacturer, would "immediately and negatively impact the important contribution electrified vehicles make in helping manufacturers … achieve compliance with annual CAFE regulations."[10] Another manufacturer explained that elimination of the Fuel Content Factor could require it to pay civil penalties under EPCA owing to shortfalls from CAFE standards.[11] For its part, Auto Innovators estimated that DOE's proposal could trigger annual CAFE penalties in the billions of dollars on an industrywide basis.[12]

---

[9] Porsche Cars North America, Inc., Comments on DOE Notice of Proposed Rulemaking for the Petroleum-Equivalent Fuel Economy Calculation, at 2 (June 12, 2023), https://www.regulations.gov/comment/EERE-2021-VT-0033-0024.

[10] *Id*.

[11] Stellantis, Comments on DOE Notice of Proposed Rulemaking for the Petroleum-Equivalent Fuel Economy Calculation, at 2 (Sept. 29, 2023), https://www.regulations.gov/comment/EERE-2021-VT-0033-0053.

[12] Auto Innovators, Comments on DOE Notice of Proposed Rulemaking for the Petroleum-Equivalent Fuel Economy Calculation, at 17 (June 12, 2023), https://www.regulations.gov/comment/EERE-2021-VT-0033-0025.

The Final Rule that DOE published in March reconsidered its proposal to eliminate the Fuel Content Factor in MY 2027. In the preamble to the Final Rule, DOE stated that "there is an adequate statutory basis for retaining the fuel content factor *for a limited time period*." 89 Fed. Reg. at 22,052 (emphasis added). DOE explained:

> Section 32904(a)(2)(B), which requires the Secretary to consider, among other things, "the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of all fuel used to generate electricity," does, however, provide a basis to apply a fuel content factor to the PEF calculation in the circumstances where applying such a fuel content factor would in fact conserve energy.

*Id.* DOE reviewed the risks of an unintended disruption of auto manufacturers' CAFE planning as well as the impacts of its proposal on the industry's efforts to expand the market for electric vehicles. Based on the evidence offered by the automakers, DOE made these findings:

> By significantly increasing the PEF, the fuel content factor makes it relatively more cost-effective for manufacturers to improve their fleets' average fuel economy by selling more EVs.… DOE concludes that EVs will remain inadequately incentivized for purposes of energy conservation over the next few years … [and that] for a limited time, retaining a fuel content factor in the PEF calculation is likely to incentivize manufacturers' production of EVs.

*Id.* at 22,050-51.

Based on those findings, DOE concluded that "immediate and complete removal of the fuel content factor from the PEF calculation would not serve the need

6

of the United States to conserve energy." *Id.* at 22,052. DOE also predicted, however, that "EVs will be adequately incentivized for purposes of energy conservation by 2030." *Id*. at 22,051. Accordingly, the Final Rule announced that "DOE has determined that the fuel content factor can be, and ought to be, phased out by 2030." *Id.*

**II.     Interest of the Moving Party and Grounds for Intervention**

Auto Innovators is a trade association whose members include automobile manufacturers who collectively sell over 95% of the new cars and light trucks in the United States. Auto Innovators represents its members in regulatory and policy matters impacting the light-duty vehicle market across the country. It has a longstanding and obvious interest in all aspects of federal regulation of automotive fuel efficiency, including DOE's regulations implementing the PEF provisions of EPCA. Because members of Auto Innovators would be directly affected by invalidation of DOE's Final Rule, Auto Innovators should be permitted to intervene in support of the federal Respondents.

**A.     Auto Innovators Has Standing to Intervene**

Auto Innovators has standing to intervene on behalf of its members. Under the Supreme Court's familiar test for associational standing in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), "its members would otherwise have standing to [intervene] in their own right; … the interests it seeks to

7

protect are germane to the organization's purpose; and … neither the [position] asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343; *see also UAW v. Brock*, 477 U.S. 274, 281 (1986) ("[A]n association may have standing … as the representative of its members." (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975))); *accord Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 946-48 (8th Cir. 2023); *Arkansas Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993).

Standing under Article III requires (1) injury-in-fact, (2) causation, and (3) redressability. An injury qualifies as a legally cognizable "injury in fact" if it is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "[T]here is ordinarily little question" that a person has standing where "[he] is himself an object" of a challenged regulation, *id.* at 561-62, and those requirements for standing are easily met here.

The auto manufacturers who are members of Auto Innovators benefit from the stability and certainty that DOE's Final Rule provides. The standing of those manufacturers is "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). Injury-in-fact exists "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317

8

(D.C. Cir. 2015); *see also Mil. Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (companies that benefitted from agency's interpretation of rule challenged by petitioners "would suffer concrete injury" if court granted petition for review).[13]

The other requirements for organizational standing are also present here. Auto Innovators' mission includes representing its members' interests in litigation concerning regulations that apply to its members. The "germaneness requirement" is met when "organizations … are obviously seeking to protect interests that are directly relevant to the organizations' purposes." *Arkansas Med. Soc'y*, 6 F.3d at 528; *see also Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (describing the "requirement of germaneness [as] undemanding … mere pertinence between litigation subject and organizational purpose is sufficient" (cleaned up)). The courts of appeals have regularly permitted Auto Innovators and its predecessors to intervene in similar proceedings without the participation of their members.[14]

---

[13] When a regulated party's standing is "self-evident," as it is in this proceeding, there is no requirement that a party file an evidentiary submission in support of its standing. *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003) (quoting *Sierra Club*, 292 F.3d at 899-900).

[14] *See, e.g.*, *Texas v. EPA*, No. 22-1031 (D.C. Cir. Apr. 20, 2022) (Per Curiam Order) (granting Auto Innovators' motion for leave to intervene in challenge to EPA greenhouse gas ("GHG") emissions standards); *Competitive Enter. Inst. v. NHTSA*, No. 20-1145 (D.C. Cir. Oct. 19, 2020) (Per Curiam Order) (same in challenge to joint EPA GHG and NHTSA fuel economy rulemaking); *California v. EPA*, 940 F.3d 1342 (D.C. Cir. 2019) (intervention by predecessors of Auto Innovators in challenge to EPA's decision to reconsider previously adopted GHG standards); *California v. EPA*, No. 08-70011 (9th Cir. Feb. 14, 2008) (Order) (granting intervention to Auto

**B.  Auto Innovators Meets the Rule 15(d) Intervention Requirements**

Auto Innovators' motion is timely.  The Petition for Review was filed on April 5, 2024.  The thirtieth day after the filing of the Petition for Review being Sunday, May 5, the thirty-day period for intervention continues until today.  *See* Fed. R. App. P. 26(a)(1)(C).

Auto Innovators' standing to represent its members in this proceeding demonstrates that it readily meets Rule 15(d)'s substantive requirements for intervention.  To be sure, DOE's Final Rule did not adopt the recommendation of Auto Innovators and its members, which was to increase and not reduce the value of the PEF.[15]  Indeed, the Final Rule *undervalues* the fuel economy of electric vehicles because they burn zero gallons of petroleum per mile driven.  Nevertheless, Auto Innovators recognizes that EPCA gives DOE some level of discretion in deciding how to serve "the need of the United States to conserve all forms of energy," and it believes the Final Rule falls within that range of discretion.  Members of Auto Innovators have a strong interest in regulatory certainty and in gradual reduction, if any reduction must occur, in the Fuel Content Factor.

---

Innovators predecessor association in state government challenge to letter from EPA Administrator concerning request for waiver of federal preemption under 42 U.S.C. § 7543(b) for state motor vehicle emissions standards).

[15] *See* Auto Innovators Comments, *supra* note 12, at 12-16.

10

Accordingly, Auto Innovators should be permitted to defend the interests of its members, inasmuch as they are "directly affected" by DOE's Final Rule. *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 744-45 (D.C. Cir. 1986); *New Mexico Dep't of Hum. Servs. v. HCFA*, 4 F.3d 882, 884 n.2 (10th Cir. 1993) ("substantial and unique interest in the outcome" warrants intervention); *Bales v. NLRB*, 914 F.2d 92, 94 (6th Cir. 1990) ("substantial interest" warrants intervention). Auto Innovators' full participation in the PEF rulemaking at DOE also supports intervention here. *See Synovus Fin. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 952 F.2d 426, 433 (D.C. Cir. 1991) (intervenor "fully participated in the proceedings" before the agency).

Though Rule 24 of the Federal Rules of Civil Procedure, governing intervention in the district courts, is not applicable here, Rule 24 can provide guidance for intervention motions under Rule 15(d). *See Sierra Club, Inc. v. EPA*, 358 F.3d 516, 517-18 (7th Cir. 2004) ("Rule 15(d) does not provide standards for intervention, so appellate courts have turned to the rules governing intervention in the district courts under Fed. R. Civ. P. 24."). If the framework of Civil Rule 24 applied, Auto Innovators would be entitled to intervene to represent the interests of its members. Auto Innovators' motion is "timely," Fed. R. Civ. P. 24(a), having been filed at the outset of this proceeding and prior to any briefing. If the Petition for Review were granted, automakers' interests in the stability and certainty provided by DOE's Final Rule, and in particular the Rule's sunset of the Fuel Content Factor

11

over multiple model years beyond MY 2026, would be "impair[ed]." *Id.* at (a)(2); *see supra* p. 5 (role of the PEF regulation in providing "stable, consistent regulatory policy" for the auto industry). The Article III standing of the automakers here, *see supra* pp. 8-9, establishes that they have "interest[s]" that would be cognizable under Rule 24(a)(2). *See Fund for Animals*, 322 F.3d at 735.

Finally, were there an issue whether the federal parties' defense of the auto industry's interests in DOE's Final Rule would be "adequate" under Civil Rule 24(a)(2), the Rule requires only that existing parties' representation of a proposed intervenor's interests "may be" inadequate, and "the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) (quoting 3B J. Moore, *Federal Practice* 24.09-1[4] (1969)). It is already apparent that the federal parties' representation of the interests of Auto Innovators' members may be inadequate. For example, sufficient lead-time for the phase-down of the Fuel Content Factor in the PEF regulation is a critical matter for Auto Innovators' members. DOE considered lead-time in the Final Rule, but it also took the position that it was not obligated to do so. *See* 89 Fed. Reg. at 22,054 ("DOE is not required to consider lead time.").

Because "[a] government entity … is charged by law with representing the public interest" and "would be shirking its duty were it to advance [a proposed intervenor's] narrower interest at the expense of its representation of the general

12

public interest," "no presumption exists that the [government] will adequately represent" the interests of a proposed intervenor. *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 1000 (8th Cir. 1993) (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986)). Likewise, Auto Innovators' grounds for intervention are reinforced by the possibility that "if the case is disposed of by settlement rather than by litigation, what [DOE] perceives as being in its interest may diverge substantially" from the interests of Auto Innovators' members. *Id.* at 1001.

## CONCLUSION

For the foregoing reasons, Auto Innovators' motion for leave to intervene should be granted.

Respectfully submitted,

CHARLES H. HAAKE
CATHERINE M. W. PALIN
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, N.W. Suite 650
Washington, D.C. 20001
(202) 326-5500

s/John C. O'Quinn
JOHN C. O'QUINN
 *Counsel of Record*
STUART DRAKE
ANNIE CHIANG
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com

*Counsel for Intervenor Alliance for Automotive Innovation*

May 6, 2024

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Alliance for Automotive Innovation certifies that it is a not-for-profit trade association of motor vehicle manufacturers, original equipment suppliers, and technology and other automotive-related companies. The Alliance for Automotive Innovation operates for the purpose of promoting the general commercial, professional, legislative, and other common interests of its members. The Alliance for Automotive Innovation does not have any outstanding shares or debt securities in the hands of the public, nor does it have a parent company. No publicly held company has a 10% or greater ownership interest in the Alliance for Automotive Innovation.

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2,947 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

s/John C. O'Quinn
John C. O'Quinn

# CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/John C. O'Quinn
John C. O'Quinn
