# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

STATE OF IOWA, et al.,

*Petitioners*,

v.

JENNIFER GRANHOLM, in her official capacity as Secretary of the United States Department of Energy, et al.,

*Respondents*,

ALLIANCE FOR AUTOMOTIVE INNOVATION,

*Respondent-Intervenor*.

On Petition for Judicial Review of a Final Action of the United States Department of Energy, 89 Fed. Reg. 22,041 (March 29, 2024)

———————

## ANSWERING BRIEF FOR RESPONDENT-INTERVENOR ALLIANCE FOR AUTOMOTIVE INNOVATION

———————

CHARLES H. HAAKE
CATHERINE M. W. PALIN
ALLIANCE FOR AUTOMOTIVE
   INNOVATION
1050 K Street, N.W. Suite 650
Washington, D.C. 20001
(202) 326-5500

JOHN C. O'QUINN
  *Counsel of Record*
STUART DRAKE
ANNIE CHIANG
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
john.oquinn@kirkland.com

*Counsel for Respondent-Intervenor Alliance for Automotive Innovation*

July 29, 2024

## SUMMARY AND POSITION ON ARGUMENT

This is a case in which a federal agency exercised discretion granted by Congress on a highly technical matter and kept an open mind in doing so. In 2021, two non-governmental organizations ("NGOs") sought elimination of a longstanding provision in DOE's regulations that recognized electric vehicles' role in reducing the nation's dependence on petroleum. DOE initially proposed to eliminate that provision in the 2027 model year. After careful consideration of public comment, DOE reconsidered, and in the Final Rule challenged here, decided to phase down the provision at issue over four model years.

Petitioners' Opening Brief makes plain their disagreement with the current Administration's energy policies, but those policy differences are not grounds for judicial review. Petitioners also object to other features of the Final Rule that align the Final Rule with other federal programs. Their proposed remedy would impose undeserved penalties on automakers that could hinder efforts to improve fuel economy. The Petition for Review should be dismissed. Respondent-Intervenor Alliance for Automotive Innovation ("Auto Innovators") concurs with the Federal Respondents' position on oral argument.

## CORPORATE DISCLOSURE STATEMENT

Respondent-Intervenor Auto Innovators is a not-for-profit trade association that represents the interests of automobile manufacturers who produce approximately 95 percent of the new cars and light trucks sold in the United States. Auto Innovators has no parent companies and has not issued shares or other securities to the public. No companies have a 10 percent or greater ownership interest in Auto Innovators.

# TABLE OF CONTENTS

SUMMARY AND POSITION ON ARGUMENT ............................................i

CORPORATE DISCLOSURE STATEMENT ..........................................ii

TABLE OF AUTHORITIES ....................................................iv

JURISDICTIONAL STATEMENT AND STATEMENT OF THE
    ISSUES ....................................................1

STATEMENT OF THE CASE ..................................................1

SUMMARY OF ARGUMENT ..................................................23

ARGUMENT ..................................................25

I.   DOE's Decision To Modify The PEF Over A Multiyear Period
    Comports With The Statutory Text And Relies On The
    Evidence In The Administrative Record ......................................25

    A.    EPCA Authorized DOE To Conserve Energy Using A
        Fuel Content Factor. ..................................................28

    B.    DOE's Decision To Not Eliminate The 1.0/0.15 Fuel
        Content Factor In MY 2027 Relied On Evidence In The
        Record, And Doing Otherwise Would Have Ignored
        Automaker Reliance Interests. ..........................................37

II.  DOE's New PEF Determination Properly Includes Estimates
    Of Electric Power Generation And Transmission Efficiencies
    Over The Life Of The Vehicle Fleet It Covers. ..............................39

III.  Petitioners' Procedural Objections Are Invalid. ..........................44

IV.  Vacatur Would Not Be A Proper Remedy Were The Court To
    Find Reason To Grant The Petition. ....................................49

CONCLUSION ..................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Donovan,*
757 F.2d 330 (D.C. Cir. 1985) .............................................. 45

*Am. Coke and Coal Chems. Inst. v. EPA,*
452 F.3d 930 (D.C. Cir. 2006) ............................................... 45

*Am. Free Enter. Chamber of Com. v. Buttigieg,*
No. 24-2224 (8th Cir. filed June 17, 2024) ......................... 22

*Beirne v. Sec'y of U.S. Dep't of Agric.,*
645 F.2d 862 (10th Cir. 1981) .............................................. 44

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.,*
467 U.S. 837 (1984) .............................................................. 32

*Citizens Telecomms. Co. of Minn. v. FCC,*
901 F.3d 991 (8th Cir. 2018) ................................... 46, 47, 48

*In re Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond,*
MCP No. 189 (J.P.M.L. July 12, 2024) .............................. 22

*Ctr. for Auto Safety v. NHTSA,*
793 F.2d 1322 (D.C. Cir. 1986) ......................................... 5, 36

*Ctr. For Biological Diversity v. NHTSA,*
538 F.3d 1172 (9th Cir. 2008) .............................................. 34

*CTS Corp. v. EPA,*
759 F.3d 52 (D.C. Cir. 2014) ............................................... 43

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) .......................................................... 26, 27

iv

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)..................................................................39

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)..............................................................38

*Feld Motor Sports, Inc. v. Traxxas, L.P.*,
861 F.3d 591 (5th Cir. 2017)...............................................43

*GPA Midstream Ass'n v. U.S. Dep't of Transp.*,
67 F.4th 1188 (D.C. Cir. 2023)............................................48

*Kentucky v. EPA*,
No. 24-1087 (D.C. Cir. filed Apr. 18, 2024) ......................21

*Leocal v. Ashcroft*,
543 U.S. 1 (2004)..................................................................32

*Liu v. SEC*,
591 U.S. 71 (2020)................................................................31

*Long Island Care at Home, Ltd. V. Coke*,
551 U.S. 158 (2007)..............................................................45

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024).........................................................30

*Ltd., Inc. v. Comm'r*,
286 F.3d 324 (6th Cir. 2002)...............................................44

*Michigan v. EPA*,
576 U.S. 743 (2015)..............................................................32

*Mkt. Synergy Grp. v. U.S. Dep't of Lab.*,
885 F.3d 676 (10th Cir. 2018)............................................46

*Music Choice v. Copyright Royalty Bd.*,
970 F.3d 418 (D.C. Cir. 2020) ............................................38

*N. States Power Co. v. United States*,
73 F.3d 764 (8th Cir. 1996)................................................27

*Nw. Airlines, Inc. v. Goldschmidt*,
  645 F.2d 1309 (8th Cir. 1981) ........................................... 44

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
  587 U.S. 601 (2019) ........................................................ 31

*Pub. Citizen v. NHTSA*,
  848 F.2d 256 (D.C. Cir. 1988) ........................................ 36

*Ransom v. FIA Card Servs., N.A.*,
  562 U.S. 61 (2011) .......................................................... 32

*Sanimax USA, LLC v. City of South St. Paul*,
  95 F.4th 551 (8th Cir. 2024) ........................................... 34

*Sec'y of Lab. v. Seward Ship's Drydock, Inc.*,
  937 F.3d 1301 (9th Cir. 2019) ........................................ 44

*Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*,
  707 F.3d 371 (D.C. Cir. 2013) ........................................ 34

*Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*,
  991 F.3d 512 (4th Cir. 2021) .......................................... 44

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ........................................................ 23

*United States v. Auginash*,
  266 F.3d 781 (8th Cir. 2001) .......................................... 34

*United States v. Jungers*,
  702 F.3d 1066 (8th Cir. 2013) ........................................ 36

*United States v. Stanchich*,
  550 F.2d 1294 (2d Cir. 1977) ......................................... 27

*Wisconsin Elec. Power Co. v. DOE*,
  778 F.2d 1 (D.C. Cir. 1985) ............................................ 32

**Statutes**

5 U.S.C. § 553(b)(3) ............................................................ 44

5 U.S.C. § 706(2) .................................................................... 34

28 U.S.C. § 2112(a)(3) ............................................................ 22

28 U.S.C. § 2401(a) ................................................................ 50

42 U.S.C. § 6295(o)(2)(B)(i) .................................................. 35

49 U.S.C. § 32902 ............................................................ 22, 41

49 U.S.C. § 32904(a)(2)(B) .............................. 2, 8, 9, 30, 43, 50

49 U.S.C. § 32909 .................................................................. 50

49 U.S.C § 32912 .................................................................. 17

49 U.S.C § 60102(a)-(b) ........................................................ 48

Chrysler Corporation Loan Guarantee Act of 1979, Pub. L.
No. 96-185, 93 Stat. 1324 (1980) .................................... 1, 10

Department of Energy Organization Act, Pub. L. No. 95-91,
91 Stat. 565 (1977) ............................................................. 6

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat.
2776 (1992) ......................................................................... 5

Energy Policy and Conservation Act, Pub. L. No. 94-163, 89
Stat. 871 (1975) ......................................................... 5, 6, 35

**Regulations**

10 C.F.R. § 474.3 .............................................................. 9, 49

45 Fed. Reg. 73,684 (Nov. 6, 1980) ...................................... 10

46 Fed. Reg. 22,747 (Apr. 21, 1981) ..................................... 10

59 Fed. Reg. 5336 (Feb. 4, 1994) .......................................... 10

64 Fed. Reg. 37,905 (July 14, 1999) ................................ 11, 12

65 Fed. Reg. 36,986 (June 12, 2000) ............................... 12, 15

86 Fed. Reg. 73,992 (Dec. 29, 2021) ................................... 13, 14

87 Fed. Reg. 29,184 (May 5, 2023) ....................................... 17

88 Fed. Reg. 21,525 (Apr. 11, 2023) ..................... 15, 31, 36, 40

89 Fed. Reg. 22,041 (Mar. 29, 2024) ........... 19, 20, 26, 31, 41, 42, 49, 50

89 Fed. Reg. 27,842 (Apr. 18, 2024) ................................... 21

89 Fed. Reg. 52,540 (June 24, 2024) .................... 22, 23, 42, 51

**Legislative Materials**

125 Cong. Rec. 4663 (1979) ............................................. 29, 30

125 Cong. Rec. 8534 (1979) ................................................. 30

125 Cong. Rec. 37083 (1979) .................................................. 7

125 Cong. Rec. 37459 (1979) .................................................. 7

Staff of Subcomm. on Trade, H. Comm. on Ways and Means,
   96th Cong., 2d Sess., Rep. *Auto Situation: 1980* (Comm.
   Print June 6, 1980) ............................................................ 28

**Other Authorities**

Alliance for Automotive Innovation, *Statement on EPA
   Greenhouse Gas Emissions and Criteria Pollutant Rules
   (2027-2032)* (Mar. 20, 2024), https://perma.cc/B9FN-
   GHCY ........................................................................... 27

Energy Information Administration, *Frequently Asked
   Questions*,
   https://www.eia.gov/tools/faqs/faq.php?id=427&t=3 (last
   updated Feb. 29, 2024) ...................................................... 16

NHTSA, *Preliminary Regulatory Impact Analysis – Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond* (July 2023)..................................................................................8, 9

## JURISDICTIONAL STATEMENT AND
## STATEMENT OF THE ISSUES

Auto Innovators adopts the Federal Respondents' Jurisdictional Statement and Statement of the Issues.

## STATEMENT OF THE CASE

Electric vehicles ("EVs") won Congressional favor early in the nation's fifty-year struggle to diversify energy sources for motor vehicles. In 1979, Congress passed legislation that directed the Department of Energy to establish a "petroleum equivalency factor," or "PEF," for electric vehicles. Electric vehicles do not burn any gasoline, so the PEF translates the electricity they use into a miles-per-gallon-of-gasoline ("mpg") number, which can be used to average those vehicles into a manufacturer's annual corporate average fuel economy ("CAFE") level.[1] The 1979 legislation specified the factors DOE had to consider in setting PEF values for electric vehicles, and it left to DOE's discretion how to assess and weigh those factors.

---

[1] *See* Brief of the Federal Respondents ("Resp.Br.") at 3-6 (describing CAFE program). Owing to its passage in December 1979, the PEF legislation was not signed by the President and published in the Statutes at Large until 1980. *See* Pub. L. No. 96-185, § 18, 93 Stat. 1324, 1336-37 (1980).

In one subsection of the PEF legislation it had enacted in 1979, Congress directed DOE to take account of the "relative scarcity and value" of the fuels used to produce electricity, and the Nation's "need … to conserve all forms of energy." 49 U.S.C. § 32904(a)(2)(B)(iii). That provision in the 1979 legislation enables DOE to assign value to EVs insofar as they expand the energy sources used by cars and trucks away from petroleum.

It would take years for EV technology to start playing a significant role in the Congressional plan for energy diversification. In June 2000, DOE established a PEF that put EVs in parity with some other alternative-fueled vehicles that could displace petroleum, which DOE called the "fuel content factor." The PEF established in June 2000 and its fuel content factor became an integral part of EV investment decisionmaking by full-line vehicle manufacturers.[2]

---

[2] "Full-line" vehicle manufacturers range in size and market positioning, but each produces and sells both EVs and vehicles powered solely by internal combustion engines ("ICEVs"). The PEF legislation and DOE's PEF regulations apply to battery-electric vehicles ("BEVs") and to gasoline-electric vehicles that recharge their batteries by plugging into the grid, i.e., plug-in hybrid electric vehicles ("PHEVs").

In 2021, the Natural Resources Defense Council ("NRDC") and the Sierra Club submitted an administrative petition to DOE that sought to amend the PEF regulation that DOE had adopted in June 2000. The NRDC/Sierra Club petition sought to remove the fuel content factor from the PEF regulation.

DOE responded to the NRDC/Sierra Club petition by inviting public comment, in a December 2021 Federal Register notice. In April 2023, DOE followed up with a Notice of Proposed Rulemaking ("NOPR"), in which DOE sought comment on an amendment to the June 2000 PEF regulation that would eliminate the fuel content factor included in the June 2000 PEF regulation, effective in MY 2027.

In their comments on the NOPR, the auto industry outlined the role of the fuel content factor in helping to diversify energy sources for motor vehicles, and in facilitating decisions to invest in EV technology. Auto Innovators' rulemaking comments also explained that both the June 2000 PEF regulation's fuel content factor and the NOPR's proposal did not adequately recognize the benefits of EVs in reducing petroleum consumption to the extent required in the 1979 PEF legislation.

In the Final Rule it promulgated in March 2024, DOE decided to eliminate the fuel content factor included in the June 2000 regulation. To its credit, however, the March 2024 Final Rule phased out the PEF from the level set in the June 2000 regulation, eliminating the fuel content factor that had been established in 2000 over a four-year period ending in MY 2030, rather than in a single model year, in MY 2027. The Final Rule left in place the PEF adopted in June 2000 for model years prior to MY 2027.

The Final Rule's disposition of the fuel content factor did not draw a judicial challenge from the NGOs who had filed the administrative petition for its removal in 2021. Petitioners sought judicial review on April 5, 2024. The remedy they seek is vacatur of the Final Rule, in addition to vacatur of all PEFs "for model years 2024 and later."[3]

## I.   The 1979 PEF Amendment To The Federal Fuel Economy Statute.

The Energy Policy and Conservation Act of 1975 ("EPCA" or "the 1975 Act") was a comprehensive response to persistent energy market volatility following the 1973 oil embargo by the OPEC cartel. "Congress

---

[3] Petrs.Br.67.

rejected both the President's proposed energy program, which relied on market mechanisms to reduce demand as [oil] prices rose," and "the President's fuel economy program, which depended on voluntary improvements by vehicle manufacturers." *Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1339 (D.C. Cir. 1986) (footnotes omitted). Instead, "Congress created mandatory fuel economy standards" in the CAFE program, *id.*, applicable to vehicles equipped with internal-combustion engines that use petroleum.

The 1975 Act directed the Department of Transportation ("DOT") to prepare a report on "whether or not electric vehicles and other vehicles not consuming fuel" should be included in EPCA's regulatory program.[4] The report filed by DOT the following year included a proposal from the

---

[4] Pub. L. No. 94-163, § 301, 89 Stat. 871, 916 (1975). Reflecting its origins in the 1973 OPEC oil embargo, EPCA had defined "fuel" for purposes of the CAFE program as "gasoline and diesel oil." *Id.* at 901. EPCA gave the Secretary of Transportation the authority to add to its definition of "fuel … any other liquid fuel or any gaseous fuel." *Id.* at 901-02. Being neither liquid nor gaseous, electricity could not be administratively added to EPCA as a "fuel." The Energy Policy Act of 1992 added electricity to EPCA's list of "alternative fuels." Pub. L. No. 102-486, § 403, 106 Stat. 2776, 2878 (1992).

Energy Research and Development Administration ("ERDA").[5] ERDA suggested an approach to EV technology that would recognize the fractional role that petroleum played as an energy source for the U.S. power grid.[6] Referring to the automotive fuel economy provisions of EPCA as "Title V,"[7] ERDA explained how Congress might stimulate interest in EVs by full-line vehicle manufacturers, and at the same time ease compliance with EPCA:

> Assuming that "electric vehicles" were included in Title V … the net result should be that a manufactured electric vehicle would be credited with or assigned a very high "equivalent-mpg" value because of very low consumption of petroleum in the utility power system resource mix. By being included in Title V, if the manufacturer also produced gasoline or diesel fueled vehicles, his ability to meet the sales-weighted mpg requirements of Title V would be considerably enhanced if he produced a sufficient number of electric vehicles.

---

[5] ERDA would be folded into the Department of Energy on DOE's creation in August 1977. *See* Department of Energy Organization Act, Pub. L. No. 95-91, § 301, 91 Stat. 565, 577 (1977).

[6] U.S. Dep't of Transp., *Advisability of Regulating Electric Vehicles for Energy Conservation: A Report to the Congress and the President from the Secretary of Transportation* (Aug. 1976), https://rosap.ntl.bts.gov/view/dot/10359 (hereinafter "1976 DOT Report") at H-54-58, Supplemental Addendum of Respondent-Intervenor ("R-I.Add.") at 18-22.

[7] In 1975, the automotive provisions of EPCA had been codified in the U.S. Code as Title V to the Motor Vehicle Information and Cost Savings Act of 1972. *See* § 301, 89 Stat. at 901.

1976 DOT Report at H-56, R-I.Add.20 (ERDA Comments, Apr. 9, 1976).[8]

ERDA's concept provided the foundation for the PEF legislation, which was added to EPCA during consideration of the Chrysler Loan Guarantee Act of 1979, on December 19, 1979.[9]  The PEF provision of EPCA provides as follows:

> If a manufacturer manufactures an electric vehicle, the [EPA] Administrator shall include in the calculation of average fuel economy … equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles. The Secretary shall review those values each year and determine and propose necessary revisions based on the following factors:
>
> (i) the approximate electrical energy efficiency of the vehicle, considering the kind of vehicle and the mission and weight of the vehicle.
>
> (ii) the national average electrical generation and transmission efficiencies.

---

[8] ERDA also noted that depending on the PEF, a manufacturer could use "very high 'equivalent-mpg' value[s]" for EVs to increase "the petroleum consumption of [its] gasoline and diesel fueled vehicles (decrease their mpg capabilities) and still meet [CAFE] standards."  1976 DOT Report at H-56, R-I.Add.20.  The PEF legislation of 1979 included "the need of the United States to conserve all forms of energy" as a factor for DOE to consider in determining a PEF, and as DOE's recently-concluded PEF rulemaking demonstrates, DOE can use that factor to address such issues.

[9] *See* 125 Cong. Rec. 37083 (1979); *see also* 125 Cong. Rec. 37459 (1979) (Senate agreement to Conf. Rep.); *id.* at 37316 (House agreement to Conf. Rep.).

(iii) the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of all fuel used to generate electricity.

(iv) the specific patterns of use of electric vehicles compared to petroleum-fueled vehicles.

49 U.S.C. § 32904(a)(2)(B).

The first step in applying a PEF to an EV, determining "the approximate electrical energy efficiency" of an EV pursuant to 49 U.S.C. § 32904(a)(2)(B)(i), is to operate the vehicle on a laboratory dynamometer, starting with a fully charged battery. The vehicle is driven on the dynamometer using driving cycles specified by DOE, which borrow from driving cycles in EPA's test procedures for ICEVs. That number is sometimes called by NHTSA the "rated" fuel economy of the tested electric vehicle.[10]

The next step is to apply the PEF value specified in DOE's regulation to the electric vehicle's rated fuel economy, in order to determine what NHTSA calls the vehicle's "compliance value," which

---

[10] See NHTSA, *Preliminary Regulatory Impact Analysis – Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond* (July 2023) at 8-7 n.150.

EPA uses in calculating the EV manufacturer's CAFE level.[11] The factors that DOE must consider in determining the PEF are specified in 49 U.S.C. § 32904(a)(2)(B)(ii)-(iv). The higher the PEF for a given model year, the greater the compliance value of EVs that manufacturers produce and sell in that model year.

## II. DOE's Implementation Of 1979 EPCA Amendment.

From the start of its efforts to implement the 1979 amendment to EPCA through rulemaking, much of DOE's attention has focused on the factors in 49 U.S.C. § 32904(a)(2)(B)(iii) (hereinafter "Subsection (iii)"), which are "the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of all fuel used to generate electricity." DOE's approach to Subsection (iii) has evolved through several rounds of rulemaking.

### A. PEF Rulemakings Prior to 2021.

DOE's first rulemaking to implement the 1979 amendment to EPCA began in 1980, in order to establish a PEF intended to apply to

---

[11] *Id. See* 10 C.F.R. § 474.3(b)-(f); Declaration of Kevin C. Stork ("Stork Decl.") ¶ 12, in Supplemental Addendum of Respondents ("Resp.Add.") at 7-8 (application of the PEF value to rated fuel economy).

EVs produced through MY 1987.[12]  In the rulemaking that commenced in 1980 and concluded in 1981, DOE addressed Subsection (iii), which DOE called at the time "the relative value factor," by calculating "the marginal energy cost of the individual fuel used to generate electricity divided by the marginal (retail) price of gasoline."  45 Fed. Reg. 73,684, 73,687 (Nov. 6, 1980); *see also* 46 Fed. Reg. 22,747 (Apr. 21, 1981) (final rule).

DOE commenced the next PEF rulemaking in February 1994.  *See* 59 Fed. Reg. 5336 (Feb. 4, 1994). DOE sought an empirically based method of quantifying the relative scarcity and value of fuels used to produce electricity, in order to address the requirements of Subsection (iii).  DOE's February 1994 notice of proposed rulemaking outlined what it called "a resource based measure of scarcity and value," which would entail "determining the U.S. percent and numeric share of the world [fossil fuel] market … and calculating the rate at which the U.S. is depleting each fuel source's reserves."  *Id.* at 5338-39.

---

[12] The EV provisions added to the Chrysler Loan Guarantee Act included a provision for a "seven-year evaluation program" of electric vehicles, to be concluded by 1987.  Pub. L. No. 96-185, § 18, 93 Stat. 1324, 1336 (1980).

DOE never finalized a PEF based on the 1994 rulemaking proposal. According to the next DOE notice of proposed rulemaking, published five years later, the "resource-based" methodology outlined in 1994 had proven to be unreliable, in part owing to "faulty assumptions and calculations [that] were present in some of the steps in the development of the scarcity factor." 64 Fed. Reg. 37,905, 37,906 (July 14, 1999). DOE reported that it had fully considered "modifications of the reserves-based approach, as well as market price (of fuels used to generate electricity) approaches," but that it had determined "that such approaches were highly sensitive to the assumptions used, and that many possible assumptions were contradictory or highly subjective." *Id.* at 37,907.

In the 1999 Federal Register publication in which it renounced its 1994 "resource-based" methodology to Subsection (iii), DOE took a new approach to Subsection (iii). DOE reported that "[i]n light of the number of criticisms related to the scarcity factor, DOE elected to perform an additional search of the literature regarding reserves of the fuels used to generate electricity." *Id.*

DOE explained that it next "examined existing law … that specifies procedures for determining the petroleum-equivalent fuel economy of other types of alternative fuel vehicles." *Id.* DOE explained that it would be guided by Congress's approach to other types of alterative-fueled vehicles:

> The petroleum equivalent fuel economy of [other alternative-fueled vehicles] is … determined by dividing the measured fuel economy value by 0.15. [EPCA] extends this approach to gaseous fueled vehicles … [even though] natural gas contains no gasoline whatsoever.… DOE proposes to adopt the [1/0/]0.15 factor to be applied in a manner similar to that prescribed for natural gas vehicles. This approach has the following advantages: (i) It is consistent with existing regulatory and statutory procedures for other types of alternative fuel vehicles, (ii) It provides a similar treatment to manufacturers of all types of alternative fuel vehicles, including electric vehicles, [and] (iii) It is relatively simple and straightforward to apply, compared to other approaches considered.

*Id.* DOE finalized the PEF that included a 1.0/0.15 fuel content factor in June 2000. *See* 65 Fed. Reg. 36,986 (June 12, 2000).

**B.    The 2021-2024 PEF Rulemaking.**

The rulemaking that culminated in the Final Rule that is the subject of this proceeding underwent three rounds of public comment: a first round addressing the NRDC/Sierra Club petition completed in early 2022; a second round responding to DOE's April 2023 NOPR indicating

that DOE would revise the PEF as the NRDC/Sierra Club petition proposed; and a third round later in 2023 that focused on the impacts on the auto industry if DOE finalized the revisions proposed in the NOPR.

1.    **The NRDC/Sierra Club Petition and the 2023 NOPR.**

The NRDC/Sierra Club petition raised questions about potential unintended consequences of DOE's June 2000 PEF regulation. According to the NRDC/Sierra Club petition, the PEF had been set in 2000 at a level that allowed the auto industry to comply with CAFE standards with "relatively small number[s] of EVs." 86 Fed. Reg. 73,992, 73,995 (Dec. 29, 2021), Petrs.App.4. The NRDC/Sierra Club petition had also claimed that the PEF set in 2000 enabled the auto industry to maintain vehicles using internal combustion engines in their product lines that had what the petition considered "below-average" fuel economy or energy efficiency while still complying with the CAFE standards set by NHTSA.[13]

---

[13] 86 Fed. Reg. at 73,996, Petrs.App.5. The petition was unaccompanied by data or analysis to support that claim. Subsequently, the NRDC/Sierra Club June 2023 comments on the NOPR attached PDF versions of Excel spreadsheets that the commenters cited to support their claims, but those comments did not discuss the contents of the spreadsheets in sufficient detail to explain how the spreadsheets supported the claims. Petitioners include the NRDC/Sierra Club June 2023 comments in their Appendix, and their Opening Brief cites those

The NRDC/Sierra Club petition called on DOE to revise the PEF in order to "optimize the overall real-world reduction in fuel consumption and achieve the core purpose of EPCA's fuel-economy chapter."[14]  In prior PEF rulemakings, DOE had not asserted that "optimiz[ation]" of "overall real-world reduction in fuel consumption," including the fuel economy of conventional vehicles, was part of its remit.  Nevertheless, the NRDC/Sierra Club petition argued that Subsection (iii) required DOE to do so.  *See id.* at 73,997.

DOE's April 2023 NOPR concurred with the NRDC/Sierra Club petition's concern regarding unintended effects of the June 2000 PEF regulation.[15]  The NOPR also agreed with the NRDC/Sierra Club petition that Subsection (iii) permitted DOE to regulate the fuel consumption of

_____

comments in support of their view that the 1.0/0.15 fuel content factor "hurts energy conservation," but Petitioners omit the spreadsheets from their filings. *See* Petrs.App.26-33; Petrs.Br.37.  In any event, analyses conducted in early 2023 likely used inputs and predictive models that are now obsolete.

[14] 86 Fed. Reg. at 73,997, Petrs.App.6.  The reference to "EPCA's fuel-economy chapter" may have intended to refer to the CAFE program's codification in Chapter 329 of Title 49.

[15] Regarding the background of the 1.0/0.15 fuel content factor in the 1999-2000 PEF rulemaking, *see* Resp.Br.32 n.3.

conventional vehicles. The NOPR explained that "[w]hile the reasons for including the [fuel content] factor in the 2000 Final Rule may have been compelling at that time, DOE believes they no longer justify inclusion of the fuel-content factor because of current EV technology and market penetration." 88 Fed. Reg. 21,525, 21,534 (Apr. 11, 2023), Petrs.App.17.[16] The NOPR proposed to eliminate the 1.0/0.15 fuel content factor and make other changes in the June 2000 PEF regulation, effective in the 2027 model year.

## 2. **Auto Industry Comments on the NOPR.**

Vehicle manufacturers and Auto Innovators responded to the NOPR's proposal to eliminate the 1.0/0.15 fuel content factor in MY 2027, in comments submitted to DOE in June 2023. One manufacturer explained that "[t]he PEF has been an example of stable, consistent regulatory policy that has for over two decades provided manufacturers

---

[16] The NOPR disagreed with DOE's earlier judgment, in the 1999-2000 rulemaking, that a PEF which included the fuel content factor "is based on the relevant factors" in the 1979 EPCA amendment "including the relative scarcity of fuel used to generate electricity." 65 Fed. Reg. at 36,988; *see* 88 Fed. Reg. at 21,530, Petrs.App.13 (April 2023 NOPR's statement that "[t]he current fuel content factor lacks legal support").

with certainty."[17]   Elimination of the existing fuel content factor, according to that manufacturer, would "immediately and negatively impact the important contribution electrified vehicles make in helping manufacturers … achieve compliance with annual CAFE regulations."[18]

In its comments, Auto Innovators opposed the elimination of the 1.0/0.15 fuel content factor and explained that such a fuel content factor actually understates the fuel economy of EVs and their role in diversifying energy sources, even in a maturing EV market.[19]   Auto

---

[17] Porsche Cars North America, Inc., Comments on DOE Notice of Proposed Rulemaking for the Petroleum-Equivalent Fuel Economy Calculation, at 2 (June 12, 2023), R-I.Add.2.

[18] *Id.*

[19] *See* Auto Innovators, Comments on DOE Notice of Proposed Rulemaking for the Petroleum-Equivalent Fuel Economy Calculation (June 12, 2023) (hereinafter "Auto.Innov.Cmts."), Petrs.App.34. The Energy Information Administration ("EIA"), a service of DOE, recently estimated that in 2023, petroleum sources were used to produce 0.4 percent of U.S. utility-scale electricity generation. *See* EIA, *Frequently Asked Questions*, https://www.eia.gov/tools/faqs/faq.php?id=427&t=3 (last updated Feb. 29, 2024).

Petitioners erroneously cite Auto Innovators' comments as stating that "the efficiency of electric automobiles is 'infinite.'"   Petrs.Br. 36. Auto Innovators stated in its comments that an EVs "fuel economy should be infinite" because it "burns zero gallons of gasoline." Auto.Innov.Cmts.13-14, Petrs.App.46-47.   Regardless of its propulsion

Innovators also presented the likely consequences of eliminating the 1.0/0.15 fuel content factor in MY 2027. Auto Innovators explained that EPA's upcoming multi-pollutant emissions standards assumed that the auto industry would increase the penetration of BEVs from 26 percent of sales in the EPA-regulated new-vehicle fleet in MY 2026 to approximately 67 percent in MY 2031.[20] Auto Innovators predicted that if DOE reduced the PEF as proposed in the NOPR, "by 2030 manufacturers would need to reach 92% [battery electric vehicle] market share" in order to comply with potential CAFE standards similar to the proposed EPA standards.[21] Auto Innovators also estimated that "[b]y 2031 with the proposed PEF, the industry CAFE shortfall would be approximately 37 miles per gallon, equivalent to $89 billion in penalties."[22] The CAFE penalties just in MY 2027 would have been $10.6

system and energy efficiency, no automobile could have "infinite" energy efficiency, using any ordinary definition of efficiency.

[20] Auto.Innov.Cmts.22, Petrs.App.55; *see* 87 Fed. Reg. 29,184, 29,329 (May 5, 2023) (EPA estimates of BEVs required to comply with EPA's new emissions standards).

[21] Auto.Innov.Cmts.22, Petrs.App.55.

[22] *Id.* at 22-23, Petrs.App.55-56. EPCA provides for civil penalties for CAFE shortfalls. *See* 49 U.S.C § 32912; Resp.Br.4.

billion under the scenarios presented in Auto Innovators' June 2023 comments.[23]

Auto Innovators also explained that improvements to internal combustion engine vehicles would not be a practical alternative to paying CAFE penalties:

> Manufacturers could alternatively (in theory, but not practicably) further increase the fuel economy of non-electric vehicles. However, this would require rapid investment of scarce additional resources in internal combustion engine vehicles, reducing capital available for investment in electric vehicles. In addition, the opportunities for engine redesigns between now (MY 2024 or potentially MY 2025 by the time the Proposed Rule is finalized) will be extremely limited. Engine design and development cycles are typically much longer than three years.

Auto.Innov.Cmts.17, Petrs.App.50[24]

---

[23] Auto.Innov.Cmts.16-17, Petrs.App.49-50.

[24] Petitioners' Opening Brief cites Auto Innovators' comments and the comments of another auto group in support of its claim that Auto Innovators and the other group stated that the industry would be required "to pay fines or increase *actual* average fuel economy by investing in more efficient gasoline automobiles." Petrs.Br.17. Neither Auto Innovators nor the other group stated that increases in investment or production of ICEVs provided a realistic alternative to paying CAFE civil penalties owing to probable shortfalls from CAFE targets in MY 2027.

### 3. **The March 2024 Final Rule.**

In September 2023, DOE decided to pressure-test Auto Innovators' analysis. DOE sought further comments from vehicle manufacturers and others on that analysis. As DOE reported in the preamble to the Final Rule:

> DOE issued letters to member companies of the Alliance that invited recipients to provide data, documents, or analysis to clarify the concerns the Alliance expressed on behalf of its member companies in its response to comments on the 2023 NOPR in relation to the proposed effective date. DOE received responses from several Alliance member companies that provided data on how the proposed PEF value could affect their ability to comply with proposed CAFE standards for MYs 2027 to MY 2031. Specifically, Hyundai, Toyota, Stellantis, [and] Mitsubishi … indicated that the proposed PEF value could lead to challenges complying with the proposed CAFE standards.

89 Fed. Reg. 22,041, 22,054 (Mar. 29, 2024), Petrs.Add.14.

As a result of the information from the auto industry, the Final Rule phased down the 1.0/0.15 fuel content factor over four model years, starting in MY 2027 and ending in MY 2030. *See id*. at 22,052, Petrs.Add.12 (Final Rule preamble Table 6). As DOE explained in response to the automaker comments:

> DOE is not required to consider lead time. However, DOE believes that applying the revised PEF beginning with MY 2027 vehicles is reasonable[.] This will provide automotive

19

manufacturers with more time to incorporate a new PEF than is required under the mandate that DOE review the PEF each year and determine if revisions to the PEF are required. Moreover, as DOE explained in the 2023 NOPR, applying revised PEF values to a predictable schedule provides greater certainty to stakeholders from year to year. Accordingly, as proposed in the 2023 NOPR, the revised PEF value will apply beginning with MY 2027 EVs.

*Id.* at 22,054, Petrs.Add.14.  DOE also explained how a phase-down that would start in MY 2027 but that would still encourage production and sale of EVs through the end of the compliance period defined in the Final Rule (MY 2030) served the objectives of the 1979 PEF legislation. Focusing in particular on "the need … to conserve all forms of energy" under Subsection (iii), DOE explained:

By significantly increasing the PEF, the fuel content factor makes it relatively more cost-effective for manufacturers to improve their fleets' average fuel economy by selling more EVs.… In the context of an emerging market for EVs, this additional near-term EV production is disproportionately valuable in leveraging network effects and further accelerating EV adoption and petroleum conservation. Because including the fuel content factor when calculating the PEF value can increase EV adoption, in the near term, which results in greater petroleum conservation, retaining the fuel content factor in the near term is consistent with "the need of the United States to conserve all forms of energy."

*Id.* at 22,051, Petrs.Add.11.

As the Federal Respondents state, the Final Rule's phase-down of the 1.0/0.15 fuel content factor and its other changes from the June 2000

PEF regulation mean that "the fuel-economy value of a model year 2030 electric vehicle will be approximately 65% lower than an equivalent model year 2026 vehicle." Resp.Br.10.

## III. Proceedings In This Court And Other Proceedings.

The Petition for Review of the Final Rule was filed in this Court on April 5, 2024. Proceedings in other courts of appeals are relevant to some of the issues presented here.

On April 18, 2024, EPA published vehicle emissions standards that will require the industry to accelerate its efforts to expand EV sales. *See* 89 Fed. Reg. 27,842 (Apr. 18, 2024).[25] The Federal Respondents have presented an analysis showing that those new emissions standards, and not the CAFE standards or the PEF, will exert the controlling regulatory influence on the number of EVs that the auto industry will produce.[26] The Federal Respondents' analysis of EPA's new emissions standards relies on the current version of NHTSA's models.[27] Auto Innovators

---

[25] A number of parties, including Petitioners in this proceeding, have filed petitions for review of EPA's new vehicle emissions standards in the D.C. Circuit. *See Kentucky v. EPA*, No. 24-1087 (filed Apr. 18, 2024).

[26] *See* Resp.Br.15; Stork Decl. ¶ 39, Resp.Add.20-21.

[27] *See* Stork Decl. ¶¶ 28, 39, Resp.Add.13-14, 20-21.

believes that the analysis presented by the Federal Respondents is reliable and fits the purpose for which it was prepared.

NHTSA agrees with the Federal Respondents' analysis. On June 24, 2024, NHTSA published new CAFE standards for MY 2027-2031 vehicles.[28] NHTSA has presented those standards those standards are "the maximum feasible average fuel economy level[s]" for those model years, the criterion it must meet when setting CAFE standards under EPCA.[29] As NHTSA noted in its preamble describing the new CAFE standards, however, EPA sets vehicle emissions standards under authority of the Clean Air Act, and those EPA standards "[o]verall …

---

[28] *See* 89 Fed. Reg. 52,540 (June 24, 2024). Petitions for review of NHTSA's new standards were filed in several courts of appeals, including one in this Court by the private Petitioner in this proceeding. *See Am. Free Enter. Chamber of Com. v. Buttigieg*, No. 24-2224 (8th Cir. filed June 17, 2024). On July 12, 2024, the petitions were consolidated by the Judicial Panel on Multidistrict Litigation in the Sixth Circuit pursuant to 28 U.S.C. § 2112(a)(3).[28] *See* Consolidation Order, *In re Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond,* MCP No. 189 (J.P.M.L. July 12, 2024); Judgment, *Am. Free Enter. Chamber of Com. v. Buttigieg,* No. 24-2224 (8th Cir. July 16, 2024).

[29] *See* 49 U.S.C. § 32902(a); 89 Fed Reg. at 52,579.

place a higher degree of stringency on manufacturers" than its CAFE standards do.  89 Fed. Reg. at 52,579.

## SUMMARY OF ARGUMENT

Petitioners' attack on the fuel content factor in the Final Rule is partly misdirected and partly based on unsupported speculation, and the rest ignores the governing statutory text.  Petitioners reiterate the NOPR's critique of the rationale for the 1.0/0.15 fuel content factor in the 1999-2000 PEF rulemaking.  But the Final Rule did not try to defend the statutory analysis in the 2000 PEF regulation.  Petitioners are attacking a position that no one is any longer defending.  And, while claiming to "start with the text" of the statute,[30] Petitioners do not finish the job.  The Final Rule's disposition of the fuel content factor rested in part on the PEF legislation's direction that DOE consider "the need … to conserve all forms of energy."  *See supra* p. 20.  Instead of explaining what "the need … to conserve all forms of energy" means, Petitioners try to bluff it out of existence, insisting that the PEF amendment to EPCA is just "a section

---

[30] Petrs.Br.32 (*quoting Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484 (2023)).

about ministerial compliance calculations." Petrs.Br.38; *see infra* pp. 31-33.

Petitioners' next gambit is to suggest that the Final Rule's explanation for denying them an abrupt end to the 1.0/0.15 fuel content factor must have been pretextual. The record contradicts such an assertion. After receiving several rounds of comment, DOE was persuaded that the auto industry could not adjust on a dime if the longstanding 1.0/0.15 fuel content factor were to be eliminated in MY 2027. Had the NOPR's proposal been finalized, there would have been only one way for the industry to handle the shortfall. That would be to pay CAFE penalties, which would not have served any useful purpose, and which according to NHTSA's most recent analysis of its CAFE program could increase new-vehicle prices. *See infra* p. 51.

Petitioners also err when they turn to other features of the Final Rule. DOE aligned its forecasts about the energy consumption of MY 2027-2030 EVs with the full-vehicle-life projections that NHTSA is using for the rest of the CAFE program. Petitioners claim that EVs will not have longevity and utility similar to gasoline-powered vehicles in the coming years. The Federal Respondents explain in detail why DOE

disagreed. *See* Resp.Br.44-47. While claiming pretext, Petitioners are surely aware that members of Auto Innovators who build cars and trucks in their States face global competition with vehicle manufacturers who have head starts in some major markets. The production and sale of EVs that compete fully with conventional vehicles is critical in the long term to the members of Auto Innovators. Electric vehicles that are world-class competitors are essential to vehicle manufacturers in the U.S. light-duty markets.

Petitioners' procedural objections to the PEF rulemaking should fare no better than their opposition to mainstream full-vehicle-life regulatory analysis. *See infra* pp. 44-48. Auto Innovators agrees with the Federal Respondents that vacatur would be improper. The regulatory scenarios created by vacatur would entail massive CAFE penalties that would set back efforts to conserve energy. *See infra* pp. 50-51.

## ARGUMENT

### I. DOE's Decision To Modify The PEF Over A Multiyear Period Comports With The Statutory Text And Relies On The Evidence In The Administrative Record.

Petitioners ignore what DOE actually decided in the Final Rule. The Final Rule adopted the NOPR's critique of the rationale for 1.0/0.15

fuel content factor developed in the 1999-2000 PEF rulemaking.  Like the NOPR, the Final Rule found that "use of 1.0/0.15 as a fuel content factor was not grounded in DOE's authority to set the PEF in section 32904," while also noting that "*a* fuel content factor"—not necessarily the 1.0/0.15 fuel content factor—"could potentially be justified under the four factors of section 32904."  89 Fed. Reg. at 22,049, Petrs.Add.9 (emphasis added).

Petitioners claim that in the Final Rule, "DOE kept a fuel-content factor that was illegal from the get-go, and came up with a pretext for its concededly illegal maneuver."  Petrs.Br.46-47.  But they cannot meet the requirements for demonstrating pretext.

A claim of pretext must show a "disconnect between the decision made and the explanation given" by the government.  *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).  Petitioners proffer two facts to support their suggestion that the Final Rule was conceived illegitimately.  Petitioners point to an appearance by auto industry executives "on stage" with federal officials, Petrs.Br.22, as is common when stakeholders support a government decision, when a different agency (EPA) announced a different final rule.  Their other evidence is a media statement from Auto Innovators that supported the EPA rule, which

noted that electric vehicles can "convert petroleum miles to electric miles" and reinforced the importance of consumer choice.[31]  Petitioners cannot even lay a foundation for pretext from such evidence, much less prove it.[32]

In Petitioners' view, however, DOE "invented" an "incentive for electrification" in the PEF regulation.  Petrs.Br.46.  To the contrary, the incentive for electrification was a creation of Congress in 1979.  While legislative history is generally disfavored when a statute is clear, and in this case the statute is clear.[33]  But Petitioners' attribution of the

---

[31] Auto Innovators, *Statement on EPA Greenhouse Gas Emissions and Criteria Pollutant Rules (2027-2032)* (Mar. 20, 2024), https://perma.cc/B9FN-GHCY.  The occasion was EPA's release to the public of new emission standards for light- and medium-duty vehicles that would be phased in over MYs 2027-2032.

[32] In *Department of Commerce,* the Supreme Court found pretextual the Commerce Department's reliance on input from another Cabinet-level agency to support inclusion of a citizenship question in the 2020 census, when extra-record evidence showed that Commerce solicited that input as a last resort in searching for justification for inclusion of that question.  588 U.S. at 783-84.  The other decision Petitioners cite along with *Department of Commerce* did not involve pretext.  *See United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (affirming jury verdict in a counterfeit case based on circumstantial hearsay).

[33] *See, e.g., N. States Power Co. v. United States*, 73 F.3d 764, 766 (8th Cir. 1996) (Arnold, C.J.).

"incentive for electrification" to DOE warrants consideration of legislative history, in order to establish the true parentage of that incentive.

## A. EPCA Authorized DOE To Conserve Energy Using A Fuel Content Factor.

As explained above, the PEF legislation of 1979 applied a concept for inclusion of EVs in the CAFE program that had been developed in 1976 by ERDA, the agency soon to be merged with others into the new Department of Energy. *See supra* pp. 5-7. ERDA's insight was that "because of very low consumption of petroleum in the utility power system resource mix," an EV could "be credited with or assigned a very high 'equivalent-mpg' value." *See supra* pp. 5-7.

ERDA's concept coincided with conditions in part of the U.S. auto industry, which by 1979 was reeling from macroeconomic disasters, caused by a second OPEC oil embargo.[34] The leader of the effort in the Senate to create incentives for EV technology was Senator James

---

[34] As a June 1980 House Report would later recount, "[t]he domestic [auto] industry and its workers have been devastated by the sudden shift in consumer demand caused by the 1979 fuel cost increases and gas lines." Staff of Subcomm. on Trade, H. Comm. on Ways and Means, 96th Cong., 2d Sess., Rep. *Auto Situation: 1980* 13 (Comm. Print June 6, 1980).

McClure (R-Idaho), who in March 1979 introduced S. 624, "A bill to lessen our dependence on foreign oil imports by advancing alternative transportation systems."[35]   Senator McClure's introductory statement conceded that investments in electric vehicles were "extremely risky," and he continued:

> [U]nder the current federal fuel economy law, only petroleum fueled vehicles are currently allowed to be used in a manufacturer's fleet average fuel economy calculation.  The legislation which I am introducing today … will require the Secretary of Energy to develop a methodology for calculating an equivalent petroleum based fuel economy value for electric vehicles ….  By allowing manufacturers to include "high fuel economy" valued electric vehicles, a manufacturer can probably sell more higher profit conventional vehicles.  This additional profit should act as an incentive to provide the risk capital for electric vehicle production.

125 Cong. Rec. 4664; *see also id.* at 4665 ("This bill provides a cost effective means for auto manufacturers to achieve the CAFE standards.").[36]

---

[35] 125 Cong. Rec. 4663 (1979).

[36] The companion bill on the House side, H.R. 3718, was introduced by Representative Tom Corcoran (R-Ill.), who explained that the legislative strategy that he had crafted with Senator McClure and others would create incentives for private investment in EVs:

> This bill encourages the production and sale of electric vehicles—commonly referred to as EV's—by allowing EV's to be included in the computation of the corporate average fuel

Senator McClure noted in his remarks that "only about 15 percent of the electricity generated in the United States is produced from oil."[37] Accordingly, the bill that was passed at the end of the year required in what is now Subsection (iii) that in setting a PEF, DOE consider the "relative scarcity and value … of all fuel used to generate electricity."[38]

As it made clear in the Final Rule, DOE understands its assignment under the 1979 PEF legislation:

> DOE begins with the statutory text. Congress directed DOE to set the PEF based, in part, on "the need of the United States to conserve all forms of energy" and "the relative scarcity and value to the United States of all fuel used to generate electricity." … [I]ncreased use of EVs, relative to [internal combustion engine ("ICE")] vehicles, would help the United

> economy standards—CAFE standards…. Thus, this bill, with only a very insignificant cost to the Department of Energy, would provide the incentive to the auto manufacturers to do what they should be doing—developing alternative, marketable vehicles which do not rely on gasoline for fuel.

125 Cong. Rec. 8534 (1979).

[37] 125 Cong. Rec. 4663 (1979).

[38] 49 U.S.C. § 32904(a)(2)(B)(iii). The text of the statute committed assessment of "the need … to conserve all forms of energy" and the "relative scarcity and value … of all fuel used to generate electricity" to the judgement of the newly organized Energy Department. Congress did not tell DOE how to weigh each factor, and so "the agency is authorized to exercise a degree of discretion" in deciding what weight to give each factor it listed. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

States meet its need to conserve all forms of energy, taking into consideration the relative scarcity and value of all fuel used to generate electricity…. EVs are substantially more energy efficient than ICE vehicles on an energy input required basis. In addition, when comparing EVs to ICE vehicles on the basis of their use of scarce fuels, EVs provide even greater fuel conservation benefits when compared to gasoline used in ICE vehicles. Accordingly, an increased use of EVs, relative to ICE vehicles, would allow the United States to get greater transportation value from relatively scarce fuels, including those used to generate electricity.

89 Fed. Reg. at 22,050, Petrs.Add.10 (citations omitted). DOE found in Subsection (iii) "an adequate statutory basis for retaining the fuel content factor for a limited time period." *Id.* at 22,052, Petrs.Add.12. As the Final Rule noted, the NOPR had itself recognized that "a fuel content factor could potentially be justified under the four factors of section 32904." *Id.* at 22,049, Petrs.Add.9 (citing 88 Fed. Reg. at 21,530, Petrs.App.13).

DOE gave meaning to each term in Subsection (iii). The Petitioners do not, because they assign no role to "the need … to conserve all forms of energy" in their reading of the statute. In so doing, Petitioners ignore the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (internal quotation marks and citation omitted); *accord Liu v. SEC,* 591 U.S. 71, 88-89

(2020); *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 70 (2011) ("[W]e must give effect to every word of a statute wherever possible." (alteration in original) (quoting *Leocal v. Ashcroft,* 543 U.S. 1, 12 (2004))). That rule applies to agencies in quasi-legislative rulemaking. Even before the Supreme Court's salutary retrenchment from *Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837 (1984), *overruled by Loper*, 144 S. Ct. 2244, there had been no doubt that "*Chevron* … [did] not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not." *Michigan v. EPA*, 576 U.S. 743, 754 (2015) (Scalia, J.).

Petitioners are engaged in their own interpretive gerrymander. They do not claim, nor could they show, that it is impossible to give meaning to the term, "the need of the United States to conserve all forms of energy." Instead, Petitioners try to "blue pencil out" that portion of the statute, with "the unhappy result of obliterating express language" that guided DOE and that explains the outcome of the Final Rule regarding the fuel content factor. *Wisconsin Elec. Power Co. v. DOE,* 778 F.2d 1, 3-4 (D.C. Cir. 1985).

After blue-penciling the first part of Subsection (iii) out of EPCA, Petitioners assert that DOE should have reverted to the method it used in the first PEF rulemaking (1980-1981) to address the other part of Subsection (iii), which pertains to "the relative scarcity and value to the United States of all fuel used to generate electricity." Under the approach taken in the 1980-81 rulemaking, DOE considered the ratio of marginal prices of all such fuels and those of gasoline to determine relative scarcity and value of all those fuels—an interpretive stretch, perhaps, but one that under the circumstances went unchallenged.

The Federal Respondents explain why marginal-price ratios of gasoline and electricity are unreliable guides to the "relative scarcity and value" of fuels used to produce electricity. *See* Resp.Br.26-27. It also bears noting that Petitioners' effort to resurrect the 1980-81 interpretation of "the relative scarcity and value" term should stumble at the start. Petitioners' Opening Brief does not cite any comment in the administrative record proposing that DOE take that approach to "relative scarcity and value." "A party must," however, "first raise an issue with an agency before seeking judicial review":

> This requirement serves at least two purposes. It ensures
> simple fairness to the agency and other affected litigants. It

also provides this Court with a record to evaluate complex regulatory issues; after all, the scope of judicial review under the APA would be significantly expanded if courts were to adjudicate administrative action without the benefit of a full airing of the issues before the agency.

*Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*, 707 F.3d 371, 384 (D.C. Cir. 2013) (Rogers, J., concurring in part and dissenting in part) (cleaned up); *see also* 5 U.S.C. § 706(2) ("[T]he court shall review the whole record or those parts of it cited by a party.").[39]

At bottom, Petitioners would prefer a different statute to the one Congress enacted. They claim that "the point of all four factors" in Section 32904(a)(2)(B) is "conserving energy and saving consumers money." Petrs.Br.37. To be sure, the "overarching goal" of the federal fuel economy law "is energy conservation." *Ctr. For Biological Diversity v. NHTSA*, 538 F.3d 1172, 1219 (9th Cir. 2008). In addition, Congress did direct DOE to make pocketbook issues a first-order concern in setting energy conservation requirements—but in a different part of EPCA. The

---

[39] Judge Rogers' statement in *Shieldalloy Metallurgical Corp.* is commonplace, and the Eighth Circuit typically adopts the approaches of other circuits if their "analysis [is] persuasive and [their] reasoning sound." *Sanimax USA, LLC v. City of South St. Paul*, 95 F.4th 551, 565-66 (8th Cir. 2024); *see also United States v. Auginash*, 266 F.3d 781, 784 (8th Cir. 2001).

automotive provisions of EPCA are contained in Title III, Part A of the 1975 Act; Part B of Title III provided for DOE efficiency standards for "Consumer Products Other Than Automobiles."[40] In the latter part of Title III, Congress expressly required DOE to balance the private costs of efficiency standards and the savings that would accrue to purchasers of products that had to meet DOE efficiency standards.[41] But not in the text of the automotive fuel economy provisions of EPCA. The Eighth Circuit, in common with sister circuits, "do[es] not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to

---

[40] 89 Stat. at 917.

[41] In Title III, Part B of EPCA, Congress called for "economically justified" efficiency standards for a variety of kitchen appliances, television sets, and HVAC equipment. *Id*. at 918, 924. To determine if standards were economically justified, DOE was directed to consider the impact of the standards on "any increase to purchasers in initial charges for, or maintenance expenses of, the covered product" along with "savings in operating costs throughout the estimated average life of the covered product." *Id*. at 925; *see also* 42 U.S.C. § 6295(o)(2)(B)(i) (current codification).

make such a requirement manifest." *United States v. Jungers*, 702 F.3d 1066, 1075 (8th Cir. 2013). [42]

Any fuel content factor, however, would find no favor with Petitioners. For example, they treat the 1.0/0.15 fuel content factor as having produced a "stunningly high final 'petroleum-equivalency factor' for electricity." Petrs.Br.13. Judging from the data, however, a 1.0/0.15 fuel content factor is actually low, not high. In 1979, 15 percent may have been an accurate estimate of the petroleum fraction of the fuels used to produce electricity. *See supra* note 19. According to estimates in the 2021-2024 PEF rulemaking docket, however, the petroleum fraction of fuels expected to be used to produce electricity in 2029 is less than one percent. *See* 88 Fed. Reg. at 21,532, Petrs.App.15. By one other estimate from DOE, in 2023 the petroleum content of those fuels was already less than one percent. *See supra* p. 16. The de minimis petroleum content in

---

[42] NHTSA is not precluded from considering consumer preferences in setting CAFE standards, and challenges to CAFE standards on grounds that too much weight has been given to those preferences and the economic impacts of CAFE standards have failed. *See, e.g.*, *Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322 (D.C. Cir. 1986); *Pub. Citizen v. NHTSA*, 848 F.2d 256 (D.C. Cir. 1988).

the energy used to produce electricity would support a much higher PEF, other factors in the statute permitting.

The fallacy of Petitioners' position is revealed in their suggestion that vehicles that burn zero gasoline should have a lower fuel economy value than vehicles that do burn gasoline. After calling the 1.0/0.15 fuel content factor "stunningly high," Petitioners restate a math exercise they found in the NOPR:

> [A] model year 2022 electric Kia Niro has a compliance fuel economy value of 390.6 mpg. 88 Fed. Reg. at 21,533 …. Without the fuel-content factor, however, the Kia's fuel economy would be 58.6 mpg. That's lower than the gasoline hybrid Kia Niro, which has a measured fuel economy of 71.1 mpg ….

*Id.* at 13-14 (footnote omitted). The example of the two Niros illustrates the need for a fuel content factor: it would be absurd if a vehicle that burns no gasoline were to have a lower CAFE compliance value than another model that did.

**B.     DOE's Decision To Not Eliminate The 1.0/0.15 Fuel Content Factor In MY 2027 Relied On Evidence In The Record, And Doing Otherwise Would Have Ignored Automaker Reliance Interests.**

Not content with the elimination of the 1.0/0.15 fuel content factor over a multi-year period, Petitioners argue that DOE practiced

"industrial policy" in the Final Rule, in which it presumed to second-guess Congress's judgment about financial incentives for EV commercialization. Petrs.Br.38. The practical reasons why the Final Rule modified the compliance period for the new PEF from the MY 2027 deadline in the NOPR are far more prosaic than any "industrial policy." The NOPR's proposal to eliminate the 1.0/0.15 fuel content factor in MY 2027 would have triggered huge EPCA penalties for the auto industry, as industry comments on the NOPR explained. The Final Rule relied on that evidence from vehicle manufacturers and Auto Innovators in deciding that the realities of automotive product planning and lead-time precluded the elimination of the fuel content factor in MY 2027. *See supra* pp. 19-20.

Moreover, had DOE wanted to take a course different from that in the Final Rule, it would have needed to consider the auto industry's reliance on the existing PEF. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016); *accord Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 428-430 (D.C. Cir. 2020).

An acknowledgement that DOE was changing course would not have been enough. Reliance doctrine would have required more. When

the government "[i]s not writing on a blank slate," and DOE certainly was not doing so in the 2021-2024 PEF rulemaking, it is "required to assess whether there [a]re reliance interests" at stake, "determine whether they are significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 33 (2020). That rule applies even when the government is changing its position because it believes the prior position was unlawful. *Id.* at 20-34. In this instance, failure by DOE to consider reliance interests and to account for them properly, had it wished to follow through with the NOPR's proposal to eliminate the 1.0/0.15 fuel content factor entirely in MY 2027, would have been "arbitrary and capricious in violation of the APA." *Id.* at 33.

## II. DOE's New PEF Determination Properly Includes Estimates Of Electric Power Generation And Transmission Efficiencies Over The Life Of The Vehicle Fleet It Covers.

When DOE sets a PEF, the PEF applies to a designated group or cohort of electric vehicles—for example, in the rulemaking concluded in March, to EVs produced in MY 2027 and later model years. EPA then applies the PEF that DOE has designated for that vehicle cohort when the Agency determines the CAFE performance for the companies that

manufactured the vehicles covered by the PEF. The PEF used in calculating a vehicle cohort's fuel economy does not change for that cohort. The annual review of the PEF required by EPCA may result in revision of the PEF for the next model year, based for example on new data about electric power generation and the national power grid, but once a PEF for a given cohort of vehicles has been set, it does not change. If the PEF for a given cohort of vehicles could be revised after being finalized by DOE, and if the revisions could affect the mpg-value assigned to that cohort, manufacturers would be unable to know in advance the impact of their EV sales on their CAFE performance.

Of course, the year in which a manufacturer produces and sells an EV is not the only year in which the EV will be operated. As the NOPR for the 2021-2024 rulemaking states, "a typical vehicle sold today will be expected to be on the road for well over a decade." 88 Fed. Reg. at 21,536, Petrs.App.19. The mix of sources for electrical energy, and the efficiencies for producing electricity from those sources and transmitting electricity to EVs, are not static. The NOPR predicted that electricity production will continue to trend toward renewable sources, and sensibly noted that a PEF based on electricity sources and

production/transmission efficiencies in the year when a contemporary EV is produced "would not account for improvements in overall grid efficiency as the grid decarbonizes … over the course of the vehicle's useful life." *Id.*; *see also* 89 Fed. Reg. at 22,046, Petrs.Add.6 ("[The] mix of energy sources changes over time and is likely to continue changing in the future.")

Like DOE, NHTSA is required by EPCA to consider "the need of the United States to conserve energy," 49 U.S.C. § 32902(f), and to do so NHTSA must estimate the longevity and use (measured in "vehicle miles traveled," or "VMT") of the vehicles for which it sets CAFE targets. For example, the longer that a given model-year or cohort of vehicles will remain in service, and the greater the VMT of those vehicles, the greater the impact of the fuel economy standards that NHTSA selects for the cohort. EPCA requires NHTSA to set CAFE targets for vehicles at "maximum feasible" levels. *See id.* § 32902(a), (f). By the time DOE was preparing the Final Rule setting a PEF for MY 2027-2030 vehicles, NHTSA was completing or had completed its forecasts of the rate at which vehicles in those model years would be retired from service, using what it calls a "scrappage model." NHTSA had also developed updated

estimates of VMT for vehicles over their service lives. *See* 89 Fed. Reg. at 52,667-68 (discussing updates to forecasts to determine maximum feasible standards).

DOE's Final Rule combined its forecasts of future electric energy sources and production/transmission efficiencies with NHTSA's projections of the survival rates and VMT for the same vehicles for which NHTSA was setting CAFE targets. NHTSA made available its scrappage model and VMT forecasts, and DOE applied them in its PEF determination. *See* 89 Fed. Reg. at 22,048-49, Petrs.Add.8-9. The upshot is that DOE and NHTSA, each of which has responsibility for ensuring that the CAFE program achieves its purposes, are using similar forecasting methods to predict the energy savings that MY 2027 and later vehicles can be predicted to achieve. As the Final Rule states, "while the average life of a vehicle is around 15 years, the influence of a fleet of vehicles produced in a given model [year] lasts much longer." *Id.* at 22,045-46, Petrs.Add.5-6. The Final Rule explained that by following NHTSA's lead, DOE could achieve a "better representation of how vehicles sold during the regulatory period will be used than did the" previously proposed methodology in the 2023 NOPR. *Id.*

Petitioners claim that EPCA precludes DOE from accounting for *any* trends in energy sources for electricity and production/transmission efficiencies. In Petitioners' view, the text of Section 32904(a)(2)(B)(ii) providing that DOE is to account for "the national average electrical generation and transmission efficiencies" means that DOE must consider the grid during the specific year that an EV is manufactured. *See* Petrs.Br.52-53.

As an initial matter, the NOPR proposed to use a five-year period to implement Section 32904(a)(2)(B)(ii). Petitioners cite no comment in the administrative record presenting their textual objection to the use of any multi-year forecasts. Their objection cannot be raised here for the first time. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).

To be sure, EPCA refers to "*the* national average electrical generation." 49 U.S.C. § 32904(a)(2)(B)(ii) (emphasis added). But Petitioners place weight on the use of the definite article that it cannot bear. "The" indicates, at most, that the speaker is referring to a specific, rather than general, item or category. *See Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 598 (5th Cir. 2017), *abrogated on other grounds by Dupree v. Younger*, 598 U.S. 729 (2023). Congress included

"the" before each factor listed in Section 32904(a)(2)(B)(i)-(iv) to make the entire text coherent and complete.  It is certainly not clear that as used here, "the" is actually code for "annual" or "calendar year," as Petitioners try to infer.  *See Sec'y of Lab. v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301, 1309 (9th Cir. 2019) (rejecting "excessive reliance" on analysis of "definite articles" in favor of "better indicators of a regulation or statute's meaning"); *Ltd., Inc. v. Comm'r*, 286 F.3d 324, 333 (6th Cir. 2002) ("Reading meaning into a definite article … is hardly the wisest place to begin statutory interpretation.").  Section 32904(a)(2)(B)(ii)'s use of the definite article evinces a good syntax, rather than hidden congressional meaning.  *See Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 520 (4th Cir. 2021).

## III.  Petitioners' Procedural Objections Are Invalid.

A notice of proposed rulemaking meets the requirements of APA § 553 if it contains an adequate "description of the subjects and issues involved."  5 U.S.C. § 553(b)(3); *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1320 (8th Cir. 1981).  A "well-settled and sound rule … permits administrative agencies to make changes in the proposed rule after the comment period without a new round of hearings."  *Beirne v. Sec'y of U.S.*

*Dep't of Agric.*, 645 F.2d 862, 865 (10th Cir. 1981). The "whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency." *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985) (citation omitted).

If a final agency action or rule is a "logical outgrowth" of what the agency proposed, objections based on a claimed lack of notice have to be overruled, lest the rulemaking process become an elongated series of successive notices. "If interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule." *Am. Coke and Coal Chems. Inst. v. EPA*, 452 F.3d 930, 938-39 (D.C. Cir. 2006); *see Long Island Care at Home, Ltd. V. Coke*, 551 U.S. 158, 174-75 (2007).

Petitioners are especially critical of the Final Rule's alignment with NHTSA's time horizon for analysis of the lifespan of the MY 2027 and later vehicle fleet, *see* Petrs.Br.47-52, though they do not show, nor could they show, how the alignment affected the parts of the Final Rule

they challenge. Regardless, the Final Rule's use of NHTSA's full-life vehicle analysis passes muster under the logical-outgrowth doctrine. Another participant in the PEF rulemaking understood well enough that use of full-life vehicle analysis was an option to the five-year analysis in the NOPR. *See Mkt. Synergy Grp. v. U.S. Dep't of Lab.*, 885 F.3d 676, 682-83 (10th Cir. 2018) (finding no violation of the APA in part because rulemaking comments "suggest[ed] that various parties anticipated that the final rule might include an option" that the agency finally adopted).

In the PEF rulemaking, the American Council for an Energy-Efficient Economy ("ACEEE") wrote that DOE should "use … projected year-by-year PEF values over the full vehicle life."[43] Petitioners try to argue that DOE cannot "bootstrap notice" from "other commenters." Petrs.Br.50-51. But, to quote Petitioners' brief (and the decision their brief quotes), ACEEE was not commenting "on other interested parties' proposals," but "on the *agency's* proposals." *Id.* at 51 (quoting *Citizens Telecomms. Co. of Minn. v. FCC*, 901 F.3d 991, 1006 (8th Cir. 2018)).

---

[43] ACEEE, Comments on DOE Notice of Proposed Rulemaking for the Petroleum-Equivalent Fuel Economy Calculation, at 1 (June 12, 2023), Resp.App.3.

*Citizens Telecomms. v. FCC* is instructive, though not for the reasons suggested by Petitioners. There, the Court considered three claims of deficient notice. In one claim, petitioner argued that the FCC regulation should be vacated because the Commission's proposed rule contemplated "a heightened regulatory scheme," and therefore the petitioner could not have anticipated the final rule would focus on deregulation. 901 F.3d at 1001. In response, the Court sided with the agency. *See id.* at 1002. As relevant here, that part of *Citizens Telecomms.* recognized that subjective expectation by petitioners, not shared by other commenters, particularly one based on assumptions about the political leanings of a previous composition of a regulatory body, is not relevant to the logical outgrowth test. Petitioners in *Citizens Telecomms.* separately claimed that they lacked adequate notice of all the criteria that the FCC would use in determining whether markets for some services were competitive. There as well, the Court overruled the objection; it did not matter within the context of the rulemaking that FCC's final rule differed from the proposed rule. *Id.* at 1004.

The only APA notice claim on which the Court in *Citizens Telecomms.* agreed with the petitioners there pertained to the portion of

the FCC's final rule that "end[ed] *ex ante* [the FCC's] regulation of transport services," which connect between different business network locations. *Id.* at 1004-05; *see id.* at 997 (description of transport services). The outcome of the APA claim on that question bears no relation to the notice objection of Petitioners here. The ACEEE comment on full-life vehicle analysis shows that informed PEF rulemaking participants understood that DOE had options and alternatives to the five-year time horizon in the NOPR. That portion of *Citizens Telecomms.* might have been relevant if, for example, DOE had decided *ex ante* in the Final Rule to carve out some vehicle classes from the PEF regulation, but DOE did nothing of the sort.[44]

---

[44] The decision in *GPA Midstream Association v. U.S. Department of Transportation*, 67 F.4th 1188 (D.C. Cir. 2023), reviewed administrative proceedings that had to comply with 49 U.S.C § 60102(a)-(b), which contains what the court called "more specific" procedures than the APA. 67 F.4th at 1197. DOT's Pipeline and Hazardous Materials Safety Administration ("PHMSA") had proposed a pipeline safety standard, which under Title 49 had to contain a risk assessment that would include cost/benefit estimates based on data and analysis. The court held that the petitioners were prejudiced by PHMSA's failure to provide data on the costs and benefits of requirements for automatic or remote-controlled shut-off valves. *Id.* at 1198.

# IV. Vacatur Would Not Be A Proper Remedy Were The Court To Find Reason To Grant The Petition.

The Federal Respondents explain that were the Court to find error, it should remand to DOE without vacating the Final Rule while DOE responds to the Court's finding. *See* Resp.Br.51-54. Auto Innovators agrees and adds two additional points.

1. The Petition for Review sought invalidation and vacatur of the Final Rule, which amended the PEF regulation for MY 2027 and later vehicles.[45] Petitioners' brief indicates, however, that they seek vacatur of PEF determinations established in the June 2000 PEF remaking for MYs 2024-2026. *See* Petrs.Br.67.

The PEF for model years prior to MY 2027 was not changed by the Final Rule.[46] It is past time for any challenge to a PEF regulation

---

[45] *See* Pet. for Review at 4.

[46] As the Federal Respondents indicate, the Final Rule's nonsubstantive revision of 10 C.F.R. § 474.3(b) to indicate that the PEF established in June 2000 applies to "model year (MY) 2024, MY 2025, and MY 2026 electric vehicles," *see* 89 Fed. Reg. at 22,059, Petrs.Add.19, "underscores that the 2024 [F]inal [R]ule did not change the petroleum-equivalency factor for model years prior to 2027." Resp.Br.54 n.8. DOE revised subsection 474.3(b) to clarify that "[i]t was not DOE's intention to imply that there would be no PEF value from the effective date of the final rule to MY 2027." 89 Fed. Reg. at 22,055, Petrs.Add.15. "Accordingly," the Final Rule states, "DOE revises § 474.3 to retain the

promulgated nearly a quarter-century ago, pursuant to 49 U.S.C. § 32909 or by any other means. *See* § 32909(b) (allowing 59 days to file petitions for review); 28 U.S.C. § 2401(a) (barring actions against the United States more than six years after first accrual of the right of action).

2. Assuming there was some way for Petitioners to reach back to the PEF for model years prior to MY 2027, vehicle manufacturers could be thrown into massive noncompliance with the CAFE standards. Manufacturers would have no time to change compliance plans for MY 2024, which is now underway. Similar challenges would exist for MY 2025, which has already begun for some manufacturers and is imminent

---

current regulatory description relating to the PEF value that applies to EVs prior to MY 2027." *Id.*

Petitioners' idea of vacatur may also imagine a different scenario. They may theorize they can obtain vacatur of the Final Rule in a way that would somehow also eliminate any PEF for electric vehicles. Such a scenario is foreclosed by the statute. The 1979 amendment to EPCA provides that "[i]f a manufacturer manufactures an electric vehicle," EPA "shall include" in the manufacturer's CAFE calculation "equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles." 49 U.S.C. § 32904(a)(2)(B).

for others. Technology and production plans for MY 2026 are largely finalized.

Manufacturers would have to address their shortfalls from the CAFE standards by paying penalties. NHTSA assumes that when vehicle manufacturers pay CAFE penalties, manufacturers try to "recoup those payments by increasing new vehicle prices." 89 Fed. Reg. at 52,810. In the CAFE rulemaking that NHTSA concluded last month, NHTSA evaluated the ramifications of civil penalties. NHTSA concluded that "civil penalties are money not spent on investments that could help manufacturers comply with higher standards in the future" and that penalties "do not improve either fuel savings or emissions reductions, and thus do not directly serve EPCA's overarching purpose." *Id.* The remedy sought by Petitioners thus would hinder efforts to conserve energy, which all parties recognize is the chief goal of EPCA.

## CONCLUSION

For the foregoing reasons and those presented in the Brief of the Federal Respondents, the Petition for Review should be dismissed.

Respectfully submitted,

s/John C. O'Quinn

CHARLES H. HAAKE
CATHERINE M. W. PALIN
ALLIANCE FOR AUTOMOTIVE
INNOVATION
1050 K Street, N.W. Suite 650
Washington, D.C. 20001
(202) 326-5500

JOHN C. O'QUINN
 *Counsel of Record*
STUART DRAKE
ANNIE CHIANG
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue,
N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com

*Counsel for Respondent-Intervenor Alliance for Automotive Innovation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,908 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

3. Pursuant to 8th Cir. R. 28A(h), this brief has been scanned for viruses and is virus-free.

<u>s/ John C. O'Quinn</u>
John C. O'Quinn

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/John C. O'Quinn
John C. O'Quinn