No. 24–1721

# In the United States Court of Appeals for the Eighth Circuit

STATE OF IOWA, et al.,
*Petitioners,*

v.

JENNIFER GRANHOLM, in her official capacity as
Secretary of the United States Department of Energy, et al.,
*Respondents.*

On Petition for Review of a Final Rule of the U.S. Department of Energy

## BRIEF OF NATURAL RESOURCES DEFENSE COUNCIL AND SIERRA CLUB AS AMICI CURIAE IN SUPPORT OF RESPONDENTS AND DENIAL

JOSHUA BERMAN
SIERRA CLUB
  50 F Street NW, 8th Floor
  Washington, D.C. 20001
  (202) 650-6062
  josh.berman@sierraclub.org

VERA PARDEE
  726 Euclid Avenue
  Berkeley, CA 94708
  (858) 717-1448
  pardeelaw@gmail.com

Counsel for Sierra Club

PETE HUFFMAN
NATURAL RESOURCES
  DEFENSE COUNCIL
  1152 15th Street NW, Suite 300
  Washington, D.C. 20005
  (202) 289-2428
  phuffman@nrdc.org

JULIA FORGIE
NATURAL RESOURCES
  DEFENSE COUNCIL
  1314 Second Street
  Santa Monica, CA 90401
  (310) 434-2351
  jforgie@nrdc.org

Counsel for NRDC

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici Curiae Natural Resources Defense Council, Inc., and Sierra Club certify that they are non-profit corporations that have no publicly held corporate parents, affiliates, and/or subsidiaries.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE ............................................. 1

SUMMARY OF ARGUMENT ................................................. 3

BACKGROUND .................................................................... 5

I.  The fuel economy program is designed to conserve fuel. ................. 7

II.  Electric vehicles conserve fuel. ....................................................... 12

III.  Increasing the petroleum-equivalency factor does *not* necessarily lead to increased electric vehicle production. .............. 15

IV.  Petitioners fail to model the effect of the remedy they seek. ........ 19

ARGUMENT ........................................................................ 20

I.  Petitioners have not shown that vacating the rule will redress their alleged injuries. .................................................................... 20

II.  If the Court concludes DOE must revisit the rule, equitable remedy considerations counsel strongly in favor of a remand without vacatur. ........................................................................... 24

    a.  Vacatur would exacerbate petitioners' claimed injury ......... 26

    b.  Vacatur would disrupt the fuel economy program and undermine its fuel conservation purpose. ........................... 27

    c.  If the Court remands with vacatur, it should require DOE to revise the equivalency value by a date certain that would be least disruptive to model year 2027 compliance. ............................................................................ 29

CONCLUSION ..................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
    781 F.3d 1271 (11th Cir. 2015) ................................................ 24, 25

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    793 F.2d 1322 (D.C. Cir. 1986) .......................................................... 8

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ......................................................... 12

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) .......................................................... 24

*Muff v. Wells Fargo Bank NA*,
    71 F.4th 1094 (8th Cir. 2023) ......................................................... 22

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ............................................................... 1

*Sierra Club v. Dep't of Transp.*,
    538 F.3d 1172 (9th Cir. 2008) ........................................................... 1

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .................................................................... 20, 21

*U.S. Steel Corp. v. EPA*,
    649 F.2d 572 (8th Cir. 1981) ....................................................... 24, 25

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ....................................................... 21

## STATUTES

49 U.S.C. § 32902 ...................................................................... 25, 27

49 U.S.C. § 32903 ............................................................................ 18

49 U.S.C. § 32904(a)(2) ...................................................... 10, 15, 25, 27

49 C.F.R. § 1.95(a) ...................................................................27

Chrysler Corporation Loan Guarantee Act of 1979,
    Pub. L. 96-185, 93 Stat. 1324 (1980)................................. 10, 11, 12

Energy Policy and Conservation Act,
    Pub. L. No. 94-163, 89 Stat. 871 (1975) ..........................................8

## RULES

45 Fed. Reg. 34,008 (May 21, 1980) ......................................12

65 Fed. Reg. 36,986 (June 12, 2000) ........................................3

86 Fed. Reg. 73,992 (Dec. 29, 2021) ......................................28

88 Fed. Reg. 21,525 (Apr. 11, 2023) ................................. 17, 28

89 Fed. Reg. 22,041 (Mar. 29, 2024) ...................................3, 28

## OTHER AUTHORITIES

Dep't of Energy, *Greenhouse Gas Emissions from Electric and*
    *Plug-In Hybrid Vehicles*,
    https://www.fueleconomy.gov/feg/Find.do?year=2024&
    vehicleId=47445&zipCode=50319&action=bt3 .............................23

Dep't of Energy, *Where the Energy Goes: Gasoline Vehicles*,
    https://www.fueleconomy.gov/feg/atv.shtml ..................................13

Dep't of State, Office of the Historian, *Oil Embargo, 1973-74*,
    https://history.state.gov/milestones/1969-1976/oil-embargo ...........7

Dep't of Transportation, Report, *Advisability of Regulating Electric*
    *Vehicles for Energy Conservation* (August 1976)...........................11

EPA, *Electric Vehicle Myths* (July 2024),
    https://www.epa.gov/greenvehicles/electric-vehicle-myths ...........23

Nat'l Public Radio, *Examining Chrysler's 1979 Rescue*
    (Nov. 12, 2008), https://tinyurl.com/bdz2hmt8 .............................10

U.S. Energy Info. Admin., *Annual Energy Review* (Sept. 2012) ............14

U.S. Energy Info. Admin., *Coal and natural gas plants will account for 98% of U.S. capacity retirements in 2023* (Feb. 7, 2023), https://tinyurl.com/ap76m5a3 ........................................................ 14

U.S. Energy Info. Admin., *Iowa, State Profile and Energy Estimates*, https://www.eia.gov/state/?sid=IA .................................................. 15

U.S. Energy Info. Admin., *Solar and battery storage to make up 81% of new U.S. electric-generating capacity in 2024* (Feb. 15, 2024), https://tinyurl.com/25xn6m94 .................................................. 14, 15

U.S. Energy Info. Admin.*, Use of Oil*, https://www.eia.gov/energyexplained/oil-and-petroleum-products/use-of-oil.php ..............................................................7

U.S. Energy Info. Admin., *What Drives Crude Oil Prices?*, https://www.eia.gov/finance/markets/crudeoil/spot_prices.php .............................................................. 7, 9

U.S. Energy Info. Admin., *What is U.S. Electricity Generation by Source?* (Feb. 2024), https://tinyurl.com/5n7fxnpc ................ 13, 14

J. Westbrook, *Electric Vehicles are Way, Way More Energy-Efficient Than Internal Combustion Vehicles*, MOTORTREND.COM (Aug. 12, 2022) ................................................. 13

# INTEREST OF AMICI CURIAE[1]

Amici Natural Resources Defense Council (NRDC) and Sierra Club submitted the 2021 petition for rulemaking to respondent Department of Energy (DOE) to update the petroleum-equivalency factor at issue in this case. We are non-profit environmental and public health advocacy organizations with a demonstrated interest in the rational functioning of the federal fuel economy program to achieve its intended fuel conservation purpose. *See, e.g.*, *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2018) (granting petition to require agency to update program non-compliance penalties to account for inflation); *Sierra Club v. Dep't of Transportation*, 538 F.3d 1172 (9th Cir. 2008) (granting petition to require agency to revise arbitrary classifications of passenger cars as trucks for compliance testing).

We—like petitioners—argued during the instant rulemaking that DOE should finalize a lower petroleum-equivalency value than the

---

[1] All parties have consented to the filing of this brief. No party or party's counsel has authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person or entity, other than amici, has contributed money that was intended to fund preparing or submitting the brief.

agency ultimately did. But we are here as friends of the Court in support of respondents, rather than petitioners, because petitioners' request to vacate the current rule is nonsensical. Vacatur would neither redress petitioners' alleged injuries nor advance the statute's energy conservation directive.

We conducted the only quantitative modeling in the record that shows the effects of changing the equivalency factor across a range of values. Petitioners conducted some limited modeling for this litigation, although as DOE points out, they made significant errors. But petitioners' modeling also suffers from a more fundamental defect: it fails to show the effect of their requested remedy of vacatur.

Both amici's modeling and petitioners' own declarations show that vacatur would exacerbate, not redress, petitioners' claimed injuries. Petitioners also make several unsupported and incorrect claims about the likely effect of changing the equivalency value. Amici submit this brief to provide the Court with clear information on the impact of the petroleum-equivalency factor, and to explain why petitioners' request for vacatur—if the Court reached the merits—should be denied.

## SUMMARY OF ARGUMENT

No matter what happens in this case, vacatur is the wrong remedy. Federal law requires an operative petroleum-equivalency value for use in the fuel economy program each year. Petitioners argue the current value was set unlawfully high, but their request for vacatur would reinstate the even higher value in effect before DOE's revision. On petitioners' theory, that higher value is presumably even more harmful to their professed interests.

Put simply, vacatur causes the petroleum-equivalency value to go up. Vacating the current rule would mean a return to the pre-rule equivalency value—a value set in 2000, *see* 65 Fed. Reg. 36,986 (June 12, 2000), and one which no party argues is valid today. The 2000 value—82,049 Watt-hours per gallon, *id.*—is higher than the values finalized in the instant rule, particularly for later model years—*e.g.*, 28,996 Watt-hours per gallon for model year 2030 and beyond, 89 Fed. Reg. 22,041, 22,053 (Mar. 29, 2024). If, as petitioners claim, they are injured because DOE did not set the current value low enough, then petitioners have not shown that vacatur—with an automatic

return to the higher value—would redress that injury. That is sufficient to find they have failed to establish standing to seek vacatur.

Nor would vacatur be the right remedy even if petitioners had established standing. If the Court determines the agency must revisit the current equivalency value, the remedial question is which value should be operative during the remand period. Even if the agency's current value were unlawfully high, vacatur would compound rather than alleviate that problem. Neither petitioners nor respondents argue that the higher previous value is valid today. Equitable considerations counsel strongly for a remand without vacatur, which would keep the relatively lower current value in effect during the remand period rather than reverting to the higher prior value.

If the Court concludes that the rule must nonetheless be vacated, the Court should remand with instructions to respondents to revise the equivalency values before they are needed for model year 2027. Although vacatur would still be disruptive, a prompt revision can reduce the disruption to the fuel economy program.

**BACKGROUND**

Before petitioning the agency to update the petroleum-equivalency factor, amici invested significant time researching why Congress included it in the federal fuel economy program. We also modeled the effects of changing the factor over a wide range of scenarios.[2]

Petitioners conducted their own, limited modeling for this litigation (Add.27–28), which, as DOE explains, contains significant errors (DOE Br. 16). Petitioners failed to include the correct vehicular emission standards set by the Environmental Protection Agency, standards which have a significant effect on the composition of the nation's vehicle fleet. Supl.Add.21–24. That omission thus calls into question all of petitioners' claims about the effect of the equivalency factor on fleet composition.

---

[2] Our modeling is in the administrative record. NRDC & Sierra Club, Comment on Notice of Proposed Rulemaking at 2 & n.2, attachments 4 & 5 (June 12, 2023), https://www.regulations.gov/document/EERE-2021-VT-0033-0020 (AR0020). Because it was performed to support our initial petition to update the equivalency factor, it used assumptions that have since been overtaken by later developments. Nonetheless, amici reference our modeling because the lessons learned there—and explained herein—are independently valid and will assist the Court in understanding the shortcomings in petitioners' litigation modeling.

But the Court does not need to disentangle dense litigation declarations to confirm petitioners' errors. There is a simpler reason why petitioners' modeling is insufficient to establish their standing: they failed to model whether their requested remedy would redress their claimed injuries. As explained below, taking petitioners' modeling at face value makes clear that vacatur would *exacerbate* their alleged injuries. That also comports with amici's modeling and how changes in the equivalency factor would be expected to impact fuel conservation.

Four brief points clarify the equivalency factor's intended purpose and the expected effects of changing it. *First*, the purpose of the fuel economy program—not surprisingly—is to *conserve fuel*. And Congress clearly intended the equivalency factor to further, rather than frustrate, that core conservation purpose. *Second*, contrary to petitioners' unsupported suggestion, electric vehicles conserve fuel and energy compared to gasoline vehicles. *Third*, increasing the equivalency factor does *not* necessarily lead to the production of more electric vehicles, as the effect of changing the factor is not as simple as petitioners imply. *Fourth,* petitioners did not model the effect of their requested remedy.

**I.     The fuel economy program is designed to conserve fuel.**

The market for oil is global. *See* U.S. Energy Info. Admin. (EIA),

*What Drives Crude Oil Prices?*, https://www.eia.gov/finance/markets/

crudeoil/spot_prices.php (visited July 29, 2024). This means the

domestic prices of oil and petroleum products derived from it are not

controlled entirely domestically. The supply and demand for petroleum

products is also highly inelastic—it takes years to develop new sources

of oil, for example—and large price changes can be necessary to balance

the market following destabilizing events. *Id.*

One such destabilizing event led Congress to create the federal

fuel economy program. In 1973, a group of foreign states imposed an oil

embargo on the United States, and the price of oil "first doubled, then

quadrupled, imposing skyrocketing costs on consumers and structural

challenges to the stability of whole national economies." Dep't of State,

Office of the Historian, *Oil Embargo, 1973-74*, https://history.state.gov

/milestones/1969-1976/oil-embargo. Motor vehicles use more petroleum

by far than any other end-use sector in the nation, *see* EIA, *Use of Oil*,

https://www.eia.gov/energyexplained/oil-and-petroleum-products/use-of-

oil.php, and Congress recognized that inefficient motor vehicles wasted

petroleum at significant cost to consumers, national security, and the economy. So, Congress enacted the Energy Policy and Conservation Act, Pub. L. No. 94–163, 89 Stat. 871 (1975), which "established a major program to bring about improved motor vehicle fuel efficiency," including "mandatory vehicle fuel economy standards, intended to be technology forcing . . . [and] strong enough to bring about the necessary fuel conservation which a national energy policy demands." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324, 1339 (D.C. Cir. 1986).

Petitioners imply (Br. 41–43) that such destabilizing events and the need for conservation are a thing of the past for our nation, given the significant increase in domestic crude oil production over the last two decades. But in fact, the period of increased domestic production from the 2000s through today corresponds with both higher and more volatile oil prices than in the past:




## Crude oil prices react to a variety of geopolitical and economic events

**Crude oil prices and key geopolitical and economic events**



$/b (real 2022 dollars)

— imported refiner acquisition cost of crude oil — WTI crude oil price

Data source: U.S. Energy Information Administration, Refinitiv An LSEG Business

Updated: Quarterly | Last Updated: 06/30/2024

1: US spare capacity exhausted
2: Arab Oil Embargo
3: Iranian Revolution
4: Iran-Iraq War
5: Saudis abandon swing producer role
6: Iraq invades Kuwait
7: Asian financial crisis

8: OPEC cuts production targets 1.7 mmbpd
9: 9-11 attacks
10: Low spare capacity
11: Global financial collapse
12: OPEC cuts production targets 4.2 mmbpd
13: OPEC production quota unchanged
14: Global pandemic reduces oil demand

Oil prices have responded to geopolitical and other events over the past 40 years. Events that disrupt supply or increase uncertainty about future oil supplies tend to drive up prices.

3

---

[3] EIA, *What Drives Crude Oil Prices?* at fig. 3, https://www.eia.gov/finance/markets/crudeoil/spot_prices.php.

Another crisis soon led Congress to encourage automakers to invest in electric vehicles as efficient options for compliance with fuel economy standards. In the late 1970s, Chrysler—then the tenth largest corporation in the United States—was facing bankruptcy after they "decided to become specialists in large, gas-guzzling cars . . . right at the time there were two different Arab oil boycotts and crises with the price of gasoline." Nat'l Public Radio, *Examining Chrysler's 1979 Rescue* (Nov. 12, 2008), https://tinyurl.com/bdz2hmt8. Congress came to the rescue with loan guarantees, in exchange for Chrysler committing to an operating plan that included "an energy efficiency plan setting forth steps to be taken by the Corporation to reduce United States dependence on petroleum." *See* Chrysler Corporation Loan Guarantee Act of 1979, Pub. L. 96-185 §§ 2(8), 4, 93 Stat. 1324 (1980).

This 1980 statute also provided that any electric vehicles an automaker produced would be included in compliance calculations for the fuel economy program. *Id.* § 18 (announcing evaluation program); *see* 49 U.S.C. § 32904(a)(2) (permanent program). Because electric vehicles do not have a "fuel economy" measurable in miles-per-gallon, Congress needed a mechanism to impute miles-per-gallon values to

automakers' electric vehicles. A contemporaneous agency report requested by Congress observed that there were many ways to do this, and attempting a pure petroleum-use equivalency would, for example, assume Congress' purpose was "to conserve only petroleum-based fuels," and "not account for differences in the 'social value' of various primary energy sources—petroleum, coal, etc." *See* Dep't of Transportation, Report, *Advisability of Regulating Electric Vehicles for Energy Conservation* at S-1, 5-5 to 5-6, 6-5 (August 1976), https://rosap.ntl.bts.gov/view/dot/10359.

Congress ultimately chose a suite of considerations to ensure broad energy conservation and delegated the expert determination to DOE. Although dubbed "equivalent petroleum based fuel economy values," Congress directed DOE to include overall energy use considerations— such as "the national average electricity generation and transmission efficiencies"—as well as to evaluate more discretionary considerations— such as "the need of the Nation to conserve all forms of energy," and "the relative scarcity and value to the Nation of all fuel used to generate electricity." Pub. L. 96-185 § 18.

At bottom, the federal fuel economy program's "overarching goal [is] fuel conservation." *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1195 (9th Cir. 2008) (quoting *Ctr. for Auto Safety*, 793 F.2d at 1340). And Congress delegated to DOE the task of determining equivalent fuel economy values for electric vehicles that would further that overarching goal. *See* Pub. L. 96-185 § 18; 45 Fed. Reg. 34,008 (May 21, 1980).

As petitioners describe it, determining the conservation effect from changing the petroleum-equivalency factor is simple: Increase equivalency values, and automakers will necessarily produce more electric vehicles. Increase the number of electric vehicles produced, and national energy consumption will go up. But, as explained next, both premises are incorrect.

## II.   Electric vehicles conserve fuel.

Petitioners note (Br. 10) that electric vehicles "are usually more efficient than gasoline automobiles because they don't combust fuel on board." That's true, but significantly understates the relative energy efficiency of electric and gasoline vehicles. Combustion is an extremely inefficient way to convert the energy in liquid fuel to useful work, and

the vast majority of energy in gasoline is lost in the engine (as heat, noise, etc.). *See, e.g.*, DOE, *Where the Energy Goes: Gasoline Vehicles*, https://www.fueleconomy.gov/feg/atv.shtml (visited July 29, 2024) ("Only about 12%–30% of the energy from the fuel you put in a conventional vehicle is used to move it down the road."). In contrast, around 90% of the energy put into an electric vehicle is converted to useful work. *See, e.g.*, J. Westbrook, *Electric Vehicles are Way, Way More Energy-Efficient Than Internal Combustion Vehicles*, MOTORTREND.COM (Aug. 12, 2022), https://tinyurl.com/2s3u8jry.

Petitioners then go on to suggest (Br. 10–11), without citation to data, that "the useful energy lost when generating electricity to charge an electric-automobile battery offsets much of the gain [from electric vehicle efficiency], as the burning of fuels to produce work is the least efficient step in both the electricity and gasoline fuel cycles." This is misleading. For one thing, it is not necessary to burn *anything* to produce electricity. About 40% of electricity in the United States today, for example, is produced from non-combustion sources such as wind, solar, and nuclear power. EIA, *What is U.S. Electricity Generation by Source?* (Feb. 2024), https://tinyurl.com/5n7fxnpc. And for purposes of

petroleum conservation, petitioners elide the fact that only 0.4% of electricity in the United States is generated by burning petroleum. *Id.*

Petitioners' view of electric vehicles and the electric grid appears rooted in decades-old data. *See, e.g.*, Br. 12, 58–59 (basing claim about vehicle range on a 1980 federal register notice). Both electric vehicles and the grid that fuels them look very different today than fifty years ago and continue to evolve rapidly. For example, in 1980, more than 50% of electricity was generated from coal combustion. *See* EIA, *Annual Energy Review* at 225, tbl. 8.2b (Sept. 2012), https://www.eia.gov/totalenergy/data/annual/pdf/aer.pdf. As of 2023, coal accounts for only about 16% of electricity generation. EIA, *What is U.S. Electricity Generation by Source?* (Feb. 2024), https://tinyurl.com/5n7fxnpc. And each year, older generating facilities are retired and new generating facilities are brought on line. The facilities being retired are overwhelmingly coal and natural gas power plants. EIA, *Coal and natural gas plants will account for 98% of U.S. capacity retirements in 2023* (Feb. 7, 2023), https://tinyurl.com/ap76m5a3. Meanwhile, replacement generating capacity—and growth in generating capacity— comes overwhelmingly from solar and wind power facilities. EIA, *Solar*

*and battery storage to make up 81% of new U.S. electric-generating capacity in 2024* (Feb. 15, 2024), https://tinyurl.com/25xn6m94.

In other words, essentially no petroleum is used either to operate or to fuel an electric vehicle. And each year, the electric grid that fuels electric vehicles is increasingly powered by sources that do not combust any fuel at all. Iowa, for example, generated 62% of its electricity from wind turbines in 2022. EIA, *Iowa*, *State Profile and Energy Estimates*, https://www.eia.gov/state/?sid=IA (visited July 29, 2024). From an energy conservation perspective, powering more vehicles from an electric grid sourced by inexhaustible sunlight and wind is clearly preferable to the use of finite and "relative[ly] scarc[e]," *cf.* 49 U.S.C. § 32904(a)(2)(B)(iii), fossil fuel reserves to fill conventional gas tanks.

## III. Increasing the petroleum-equivalency factor does *not* necessarily lead to increased electric vehicle production.

Petitioners are also incorrect that increasing the petroleum-equivalency factor will necessarily result in automakers producing more electric vehicles. At first glance, it might appear that the higher the fuel economy imputed to an electric vehicle, the higher an automaker's production incentive. However, the incentive to produce a first few

15

electric vehicles is not the same as a continuing marginal incentive to produce additional electric vehicles.

Fuel economy standards require automakers to achieve an *average* level of fuel economy across their fleets. For compliance purposes, this means that an above-the-average-standard vehicle can "offset" a below-the-average-standard vehicle. And a few *way*-above-the-average-standard vehicles can offset more than a few below-the-average-standard vehicles. The higher the fuel economy imputed to each electric vehicle, the fewer electric vehicles are needed to offset below-average gasoline vehicles. The number needed depends, among other things, on the number of vehicles in, and the fuel economy distribution of, automakers' fleets. But once an automaker has enough above-average vehicles to bring its fleet into compliance, the standards no longer provide an impetus to produce higher-efficiency vehicles.

This point is not novel, nor is it subject to serious dispute. As respondent-intervenor Alliance for Automotive Innovation observes, in 1976 a predecessor agency to DOE explained that "a manufacturer could use very high equivalent-mpg values for [electric vehicles] to increase the petroleum consumption of its gasoline and diesel fueled

vehicles (decrease their mpg capabilities) and still meet CAFE standards." R-I.Br. 6–7 & n.8 (cleaned up).[4] DOE recently rearticulated this point, acknowledging that "high imputed fuel economy values for [electric vehicles] means that a relatively small number of [electric vehicles] could mathematically guarantee compliance without meaningful improvements in the real-world average fuel economy of automakers' overall fleets." 88 Fed. Reg. 21,525, 21,540 (Apr. 11, 2023).

To illustrate with an extreme example, if DOE set the equivalency factor so high that an average electric vehicle was valued at one trillion miles-per-gallon, there would be an enormous incentive for an automaker to produce some electric vehicles for compliance purposes. But the astronomically high equivalency value would provide no real incentive to produce significant *additional* numbers of electric vehicles beyond those needed for compliance. A "relatively small number," *id.*, of

_____

[4] Respondent-intervenor critiques amici for making this very same point "unaccompanied by data" in our rulemaking petition. R-I.Br. 13 & n.13. The point, though, is not an empirical one for which data is necessary. The point is mathematical. Compliance with fuel economy standards is determined by calculation of a weighted mathematical average. *See* 49 U.S.C. § 32904(a). It is an inescapable mathematical fact that including more above-the-average values allows including more below-the-average values to maintain the same average.

vehicles would satisfy the automaker's compliance obligation. The rest of its production would be determined by other considerations, including, presumably, maximizing per-vehicle profitability. That might or might not mean producing more electric vehicles.[5]

In other words, more compliance credit for electric vehicles through a higher equivalency value does *not* necessarily mean more electric vehicles will be produced. And the effect of any particular equivalency value depends on various factors, including the stringency of the average standard and the composition of automakers' fleets. This is why amici conducted extensive modeling on the effect of changing the petroleum-equivalency factor across a range of scenarios. As explained next, petitioners' limited litigation modeling provides insufficient information on the expected effects of changing the equivalency factor.

_____

[5] An automaker might elect to produce additional electric vehicles to earn overcompliance credits to save or sell to another automaker. *See* 49 U.S.C. § 32903. But those credits are only valuable if other automakers did not produce enough above-average vehicles themselves. The point remains that once enough above-average vehicles are produced to ensure fleetwide compliance on average, the standards themselves no longer provide a continuing marginal incentive to produce additional electric vehicles, regardless of the magnitude of the equivalency factor.

## IV.   Petitioners fail to model the effect of the remedy they seek.

Petitioners' modeling setup is simple. They ran the fuel economy model twice: once using DOE's *proposed* equivalency value and once using DOE's *final* equivalency value, with everything else held constant. That ostensibly enables comparing the effects of the two different values. Add.27–28.[6]

Their conclusion is also simple. Using a higher equivalency value leads to higher carbon dioxide emissions and higher energy consumption (Add.24–25)—outcomes petitioners say harm them.

But that is as far as petitioners went. And stopping short, as explained below, is fatal to petitioners' case here. They seek vacatur, a remedy that would reinstate the even higher previous equivalency value. *See* DOE Br. 52. But petitioners' modeling conclusion—that higher equivalency values harm them—reinforces that vacatur would harm them even more. Amici's record modeling likewise shows that vacatur would be expected to exacerbate those claimed injuries.

---

[6] Petitioners model this comparison twice, first assuming no new increase in fuel economy standards and second assuming the standards increase as proposed by the Department of Transportation starting in model year 2027. Add.27–28.

## ARGUMENT

**I. Petitioners have not shown that vacating the rule will redress their alleged injuries.**

Petitioners claim (Br. 25) that they are injured because DOE finalized a higher petroleum-equivalency factor than the agency had initially proposed. But petitioners seek vacatur (Br. 67), a remedy that would result in an even higher factor. *See* DOE Br. 52. On petitioners' own logic, that result would exacerbate rather than redress their injury. Petitioners have not shown that vacatur is likely to redress their claimed injuries, and the Court should thus find they lack standing to seek that remedy. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (redressability requires "a likelihood that the requested relief will redress the alleged injury").

In seeking to demonstrate their standing, petitioners rely on modeling performed for use in litigation declarations. Br. 25. As explained above, that modeling compared effects of using the equivalency factor in DOE's proposal to effects of using the higher equivalency factor in DOE's final rule. *See, e.g.*, Add.24. According to petitioners, when the higher final factor is used, bad things happen:

total energy consumption and carbon dioxide emissions increase. Br. 25;

Add.24–25.

The problem for petitioners, however, is that comparing the proposal to the final rule does not show the effects of petitioners' requested remedy. Petitioners are not asking the Court to order DOE to adopt the proposed factor—nor could they. They are asking the Court to vacate DOE's rule, an action that would automatically reinstate the prior equivalency value. *See United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (vacating revision of prior standard "*automatically* resurrects" the prior standard). Petitioners must show that their requested remedy—vacatur—is likely to redress their claimed injuries. *Cf. Steel Co.*, 523 U.S. at 109–10 (finding no standing where "none of the relief sought by respondent would likely remedy its alleged injury"). They have failed to do so.

Rather than providing any factual basis for standing, petitioners' modeling reinforces the conclusion that reinstating the 2000 value would exacerbate, rather than redress, their claimed injuries. Their modeling shows that moving from a lower equivalency value (the proposal) to a higher equivalency value (the final rule) increases total

energy consumption and carbon dioxide emissions. Add.24–25. Under that logic, an even higher equivalency value (the 2000 rule) should increase those allegedly harmful effects even more. That result is directionally consistent with the modeling amici submitted to the agency. Petitioners have made no attempt to show what will happen upon vacatur, let alone that reinstating the higher prior value would redress their injuries. They have thus failed to meet their burden to establish standing to seek vacatur.

Petitioners make other claims about the effects of changing the equivalency factor, but likewise fail to support those claims. They repeatedly claim (Br. 25–29) that a higher factor incentivizes the sale of electric vehicles relative to gasoline vehicles. But petitioners do not clearly allege that more electric vehicles will in fact be produced, and, regardless, they provide no support for such an allegation. *Cf. Muff v. Wells Fargo Bank NA*, 71 F.4th 1094, 1100 (8th Cir. 2023) (standing must be supported by specific facts rather than generalized factual allegations).

Petitioners' theory simply assumes without evidence that a higher equivalency factor *necessarily* means more electric vehicles will be

produced. But as explained above, *supra* Background § III, that is not a valid assumption. As amici learned from their modeling submitted to the record, using a higher equivalency value can indeed result in a lower fleet proportion of electric vehicles.

Finally, petitioners' suggestion (Br. 25) that their modeled increase in carbon dioxide emissions shows an increase in electric vehicles because electric vehicles are the *cause* of those increased emissions, is wholly unsupported. It is also nonsense. Replacing an average gasoline vehicle with an average electric vehicle demonstrably *decreases* emissions. *See, e.g.*, EPA, *Electric Vehicle Myths* (July 2024), https://www.epa.gov/greenvehicles/electric-vehicle-myths. And the magnitude of the decrease can be calculated with considerable accuracy. For example, a 2024 electric Chevy Blazer (AWD) charged on the grid at the Iowa Statehouse would generate only 175 grams of carbon dioxide per mile driven, compared to 319 grams per mile for an average new gasoline vehicle. DOE, *Greenhouse Gas Emissions from Electric and Plug-In Hybrid Vehicles* (calculator results for zip code 50319 on July 29, 2024), https://www.fueleconomy.gov/feg/Find.do?year=2024& vehicleId=47445&zipCode=50319&action=bt3.

In short, petitioners have not met their burden to show that
vacating the current equivalency factor would redress their claimed
injuries. The Court should find they lack standing to seek vacatur.

## II. If the Court concludes DOE must revisit the rule, equitable remedy considerations counsel strongly in favor of a remand without vacatur.

Although vacatur is the typical remedy for arbitrary or capricious
agency action, *e.g.*, *Iowa League of Cities v. EPA*, 711 F.3d 844, 875 (8th
Cir. 2013), it is not the only remedy, *e.g.*, *U.S. Steel Corp. v. EPA*, 649
F.2d 572, 577 (8th Cir. 1981) (remanding agency determination made
without proper notice and comment, but leaving the determination in
effect during period of reconsideration). Every circuit to have considered
the question has concluded that courts have the power to remand
agency rules without vacatur in appropriate cases. *See, e.g.*, *Black
Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271,
1290 (11th Cir. 2015) (collecting cases). If the Court reaches the merits
and concludes that DOE erred in its determination of the petroleum-
equivalency factor, amici agree with respondents that remand without
vacatur is the appropriate remedy. *See* DOE Br. 51–54.

"In deciding whether an agency's action should be remanded without vacatur, a court must balance the equities," *Black Warrior Riverkeeper*, 781 F.3d at 1290, and "determine what relief will best remedy the injury suffered by [petitioners] but minimize any frustration of the purposes of the [Energy Policy and Conservation Act]," *see U.S. Steel,* 649 F.2d at 576. Here, this inquiry begins with the recognition of DOE's non-discretionary duty to determine a petroleum-equivalency factor for each model year of new vehicles regulated under the federal fuel economy program. *See* 49 U.S.C. § 32904(a)(2)(B).[7] DOE's process ultimately must reduce to a number—a number that converts an electric vehicle's electrical efficiency into a miles-per-gallon value. *See id*. Thus, the agency has no choice but to regulate, and if the Court remands the rule, it is a matter of when, not if, the agency promulgates a revised equivalency number. The question, then, is what equivalency value will be operative on remand while DOE is revising the number in

_____

[7] Likewise, the Department of Transportation has a non-discretionary duty to put fuel economy standards in place for each model year. *See* 49 U.S.C. § 32902.

response to the Court's decision. As explained below, the equitable considerations counsel strongly in favor of a remand without vacatur.

### a. Vacatur would exacerbate petitioners' claimed injury.

Petitioners argue they are injured because DOE erred and set the equivalency value too high—*e.g.*, by including a fuel content factor that inflates the value (Br. 30). If petitioners are correct, then on remand DOE will likely need to promulgate a *lower* equivalency value.

In these circumstances, vacatur, by further increasing the operative equivalency value, would exacerbate DOE's error—and thus exacerbate petitioners' claimed injury. Vacatur is therefore not an appropriate remedy. If DOE did set the current values unlawfully high, these current values are at a minimum *closer* to lawful values today than the higher value set in 2000. As such, equitable considerations counsel strongly against putting an unquestionably inaccurate regulation back in place—compounding any injury to petitioners that results from a higher equivalency value—rather than remanding without vacatur, which would temporarily retain the lower and more accurate current values while the agency addresses this Court's decision.

### b. *Vacatur would disrupt the fuel economy program and undermine its fuel conservation purpose.*

The Energy Policy and Conservation Act requires that electric vehicles be included in fuel economy program compliance calculations. 49 U.S.C. § 32904(a)(2)(B). Reverting to the equivalency value promulgated in 2000 would impute a very high fuel economy to each electric vehicle (at a level that neither petitioners nor respondents contend is valid). This would increase program compliance credit without any corresponding increase in real-world fuel economy— meaning a compliant fleet will be *less efficient* than it otherwise would have needed to be, undercutting the Congressional mandate to conserve energy to the "maximum feasible" extent. *See id.* § 32902(a). Reverting to the 2000 value would also create incentives that run opposite to those created by any plausible value set by DOE post-remand.

Importantly, DOE is not the agency that sets the yearly fuel economy standards. Those standards are set by the National Highway Traffic Safety Administration (NHTSA) within the Department of Transportation. *See* 49 C.F.R. § 1.95(a). The petroleum-equivalency factor is an important consideration for NHTSA's regulatory process as it is necessary to determine the existing fuel economy compliance level

of automakers' fleets before setting standards. The factor is also required to calculate the fuel economy level achieved by automakers each year to determine compliance with those standards. In other words, until DOE revises the petroleum-equivalency factor in response to a remand from the Court, automakers will not know the fleet makeup necessary to comply with NHTSA's fuel economy standards.

The timing of DOE's revision is also uncertain. Petitioners argue (*see, e.g.*, Br. 60) that certain revisions would require DOE to engage in a new, full round of notice and comment rulemaking. For the current rule, several years elapsed between DOE providing public notice of amici's petition for rulemaking, 86 Fed. Reg. 73,992 (Dec. 29, 2021), to proposing new regulations, 88 Fed. Reg. 21,525 (Apr. 11, 2023), to the publication of the final rule, 89 Fed. Reg. 22,041 (Mar. 29, 2024). Uncertainty about the standards and compliance will persist for however long DOE takes to address any errors in the current rule, solicit public comment on its proposed revisions, address those comments, and finalize new petroleum-equivalency values.

To be sure, any remand—including without vacatur—will introduce some uncertainty. But whatever post-remand value DOE

finalizes will very likely be much closer to the current determination (made in 2024) than the prior determination (made in 2000). It would be significantly less disruptive if the more recent determination remained in place while the agency addresses the Court's decision.

### c. If the Court remands with vacatur, it should require DOE to revise the equivalency value by a date certain that would be least disruptive to model year 2027 compliance.

Although any uncertainty about the magnitude of the petroleum-equivalency factor and the timing of revisions would be disruptive, the most significant effects will start to be felt with planning for and compliance with fuel economy standards for model year 2027—the first year affected by DOE's action here. 89 Fed. Reg. at 22,042. Should the Court be concerned that remand without vacatur is not the correct remedy, the Court could instead vacate and remand with instructions for DOE to revise the equivalency value by a date that would be least disruptive to model year 2027 compliance.

Although DOE took several years to act on amici's rulemaking petition and finalize new petroleum-equivalency values, that action revised a twenty-year-old determination and addressed the full suite of statutory considerations. On remand here, DOE would revisit its very

recent determination, and address discrete issues under the Court's guidance, allowing the agency to quickly finalize a new rule.

## CONCLUSION

The Court should dismiss the petitions for review. If, however, the Court determines that respondents must revisit and correct an error in the final rule, the Court should remand the rule to DOE without vacating it.

Dated: August 5, 2024

Respectfully submitted,

*/s/ Pete Huffman*
Pete Huffman
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-2428
phuffman@nrdc.org

Julia Forgie
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401

*Counsel for*
*Natural Resources Defense Council*

Joshua Berman
Sierra Club
50 F Street NW, 8th Floor
Washington, D.C. 20001
(202) 650-6062
josh.berman@sierraclub.org

Vera Pardee
726 Euclid Avenue
Berkeley, CA 94708

*Counsel for Sierra Club*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I certify that:

This brief complies with Rule 29(a)(5)'s type-volume limitation because it contains 5292 words (as determined by the Microsoft Word word-processing system used to prepare the brief), excluding the parts of the brief exempted by Rule 32(f).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using the Office 365 version of Microsoft Word in 14-point Century Schoolbook font.

The electronic version of this filing was automatically scanned for viruses and found to contain no known viruses.

*/s/ Pete Huffman*
Pete Huffman

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2024, I caused the foregoing to be filed electronically with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system. Participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

_/s/ Pete Huffman_____
Pete Huffman