No. 24-1721

# In the United States Court of Appeals for the Eighth Circuit

**STATE OF IOWA, et al.,**

*Petitioners,*

**v.**

**JENNIFER GRANHOLM, et al.,**

*Respondents.*

On Petition for Review of a Rule of the Department of Energy

## REPLY BRIEF OF PETITIONERS

MICHAEL BUSCHBACHER
   *Counsel of Record*
R. TRENT MCCOTTER
JAMES R. CONDE
LAURA B. RUPPALT
BOYDEN GRAY PLLC
801 17th Street NW, #350
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for the American Free Enterprise Chamber of Commerce*

BRENNA BIRD
Iowa Attorney General
ERIC H. WESSAN
*Solicitor General*
PATRICK VALENCIA
*Deputy Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

*(Additional counsel listed after signature block)*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................... 1

STANDING ............................................................................................ 2

    I.    Petitioners Have Established Standing ................................. 2

    II.   EPA's Subsequent Regulations Don't Affect Jurisdiction ...... 5

        A.    EPA's Subsequent Regulations Are Not Relevant to Standing .......................................................................... 6

        B.    EPA's Subsequent Regulations Don't Moot the Case ... 8

    III.  The States Have Standing .................................................... 16

        A.    The States Have Shown *Massachusetts* Standing ...... 16

        B.    Other State Injuries Are Not "Too Attenuated" .......... 18

    IV.  AmFree Has Standing .......................................................... 21

ARGUMENT ........................................................................................ 23

    I.    The Fuel-Content Factor Is Unlawful .................................. 23

    II.   DOE's Cumulative Gasoline-Equivalency Methodology Is Unlawful .............................................................................. 33

    III.  DOE's Failure to Account for Differences in Patterns of Use Is Unlawful .................................................................. 37

    IV.  DOE's Explanation for the Two-Cycle Test Procedure Is Arbitrary .............................................................................. 42

    V.   Vacatur Is the Proper Remedy ............................................ 44

CONCLUSION ..................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Slater,*
528 U.S. 216 (2000) ............................................................ 8

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
937 F.3d 559 (D.C. Cir. 2019) ......................................... 30

*Am. Pub. Gas Ass'n v. DOE,*
22 F.4th 1018 (D.C. Cir. 2022) ......................................... 45

*Am. Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008) ......................................... 41

*Animal Legal Def. Fund v. Reynolds,*
89 F.4th 1071 (8th Cir. 2024) .......................................... 10

*Belmont Mun. Light Dep't v. FERC,*
38 F.4th 173 (D.C. Cir. 2022) .......................................... 21

*Bennett v. Spear,*
520 U.S. 154 (1997) ....................................................... 9, 10

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) .................................................. 18, 21

*Brownback v. King,*
592 U.S. 209 (2021) ......................................................... 11

*CFTC v. Schor,*
478 U.S. 833 (1986) ......................................................... 27

*Cnty. of Los Angeles v. Davis,*
440 U.S. 625 (1979) ......................................................... 12

*Competitive Enter. Inst. v. FCC,*
970 F.3d 372 (D.C. Cir. 2020) ........................................... 3

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
　144 S. Ct. 2440 (2024) .............................................................. 3

*Czyzewski v. Jevic Holding Corp.*,
　580 U.S. 451 (2017) .................................................................. 20

*Darby v. Cisneros*,
　509 U.S. 137 (1993) .................................................................. 30

*Davis v. FEC*,
　554 U.S. 724 (2008) .................................................................... 7

*Dep't of Com. v. New York*,
　588 U.S. 752 (2019) ........................................................ 3, 19, 26

*DHS v. Regents of the Univ. of Cal.*,
　591 U.S. 1 (2020) .................................................................. 31, 32

*Edison Elec. Inst. v. EPA*,
　996 F.2d 326 (D.C. Cir. 1993) ................................................ 46

*Energy Future Coal. v. EPA*,
　793 F.3d 141 (D.C. Cir. 2015) ................................................ 22

*FDA v. All. for Hippocratic Med.*,
　602 U.S. 367 (2024) .................................................................... 2

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
　No. 23-3230, 2024 WL 3737366 (8th Cir. Aug. 9, 2024) .............. 24, 26

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),
　Inc.*, 528 U.S. 167 (2000) .................................................. 6, 16

*GPA Midstream Ass'n v. DOT*,
　67 F.4th 1188 (D.C. Cir. 2023) ............................................ 7, 37

*Humane Soc'y v. USDA*,
　41 F.4th 564 (D.C. Cir. 2022) .................................................... 7

*In re Core Commc'ns, Inc.*,
　531 F.3d 849 (D.C. Cir. 2008) ................................................ 45

iii

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) .................................................... 3

*Kentucky v. EPA*,
    No. 24-1087 (D.C. Cir. filed Apr. 18, 2024) ........................... 8

*Khodara Env't, Inc. v. Blakey*,
    376 F.3d 187 (3d Cir. 2004) ........................................... 9, 10

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ....................................27, 28, 30, 35, 36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................ 11

*Luna Perez v. Sturgis Pub. Schs.*,
    598 U.S. 142 (2023) ............................................................ 25

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ............................................................ 19

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ....................................... 3, 14, 16, 18, 28

*McNaught v. Nolen*,
    76 F.4th 764 (8th Cir. 2023) ................................................ 6

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. Cir. 2023) .............................................. 9

*Menorah Med. Ctr. v. Heckler*,
    768 F.2d 292 (8th Cir. 1985) .............................................. 44

*Michigan v. EPA*,
    576 U.S. 743 (2015) ............................................................ 31

*Miller v. Thurston*,
    967 F.3d 727 (8th Cir. 2020) .............................................. 11

*Minn. Citizens Concerned for Life v. FEC*,
    113 F.3d 129 (8th Cir. 1997) .............................................. 10

*Moore v. Harper*,
   600 U.S. 1 (2023) ........................................................ 9

*NRDC v. NHTSA*,
   No. 22-1080 (D.C. Cir.) ............................................ 47

*NRDC v. NHTSA*,
   894 F.3d 95 (2d Cir. 2018) .......................... 3, 7, 16

*NRDC v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ................................... 4

*Ohio v. EPA*,
   144 S. Ct. 2040 (2024) .......................................... 30

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ................................................ 24

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ................................. 2

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) ................................. 20

*Small Refiner Lead Phase-Down Task Force v. EPA*,
   705 F.2d 506 (D.C. Cir. 1983) ............................... 44

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't
Prot.*, 560 U.S. 702 (2010) ..................................... 17

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ................................. 30

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ................................. 20

*United States v. Texas*,
   599 U.S. 670 (2023) ............................................... 18

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ............................................... 42

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................. 11

*Watt v. Energy Action Educ. Found.,*
    454 U.S. 151 (1981) ................................................................. 19

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................... 6

*Wieland v. HHS,*
    793 F.3d 949 (8th Cir. 2015) .................................................... 9

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ................................................................. 19

**Statutes**

5 U.S.C. § 553(b) ............................................................................ 42

5 U.S.C. § 553(c) ............................................................................ 42

5 U.S.C. § 703 ................................................................................ 45

5 U.S.C. § 706(2)(A), (C) .............................................................. 32

42 U.S.C. § 7607(b) ................................................................... 7, 8

44 U.S.C. § 1507 ............................................................................. 7

49 U.S.C. § 32902(h) .................................................................... 47

49 U.S.C. § 32904(a)(2)(B) .......................... 11, 23, 32, 35, 38, 46

49 U.S.C. § 32905 ......................................................................... 26

Cal. Code Regs. tit. 13, § 1962.4 ................................................. 38

**Other Authorities**

2023 EPA Automotive Trends Report ........................................... 20

46 Fed. Reg. 22,747 (Apr. 21, 1981) ........................................... 35

88 Fed. Reg. 21,525 (Apr. 11, 2023) ...................................... 26, 29, 34, 38

88 Fed. Reg. 56,128 (Aug. 17, 2023) ........................................... 10

89 Fed. Reg. 22,041 (Mar. 29, 2024) .......................................... 23, 44, 46

89 Fed. Reg. 27,842 (Apr. 18, 2024) ............................................. 5, 7, 17

89 Fed. Reg. 52,540 (June 24, 2024) ..................................... 5, 12, 14, 15

DOE, *Fact of the Week #1332* (Mar. 4, 2024) .......................................... 40

Energy Info. Admin., FAQs: *What is U.S. Electricity Generation* by *Energy Source?* (last updated Feb. 2024) .................. 24

EPA, Regulatory Impact Analysis, EPA-420-R-24-004 (Mar. 2023) ................................................................. 21

Florida Highway Safety and Motor Vehicles Fees ................................. 20

Greg S. Fink, *Ford Lost $130,000 on Every EV It Sold in the First Quarter*, Car & Driver (Apr. 26, 2024) ....................................... 38

Gregory Pannone & Dave VanderWerp, *Comparison of On-Road Highway Fuel Economy and All-Electric Range to Label Values: Are the Current Label Procedures Appropriate for Electric Vehicles?*, SAE Tech. Paper 2023-01-0349 (2023) ............................................... 43

John Bozzella, *Petroleum-Equivalency Factor: 101* (Mar. 19, 2024) ................................................................. 15

Jonathan Swift, *Gulliver's Travels* (1726) .................................... 13

Mike Colias, *Ford Shrinks Its EV Rollout Plans as Demand Lags*, Wall St. J. (Aug. 21, 2024) .......................................... 37

*Transcript: Transportation Secretary Pete Buttigieg on "Face the Nation,"* CBS News (May 26, 2024) .............................. 39

# INTRODUCTION

The federal agencies' brief confirms what Petitioners have argued all along. The Department of Energy's ("DOE's") decision to continue inflating the efficiency of electric automobiles by nearly seven was not premised on any "revised" reading of the law. Rather, as the agencies now admit, DOE simply "re-adopted" the same extralegal 666% fuel-content factor as a "baseline," even though DOE has admitted that factor has "no basis" in the statute. The agencies further admit that DOE adopted this approach so that the efficiency of electric automobiles would no longer be "approximate," as the law requires, but "inflated." Last, the agencies concede that the relative "scarcity" of petroleum was a fig leaf that had nothing to do with DOE's decision. Rather, DOE decided that Congress has not done enough to ensure manufacturers meet the Administration's target market share of electric automobiles. But Congress, not DOE, gets to decide how much subsidy is subsidy enough. This Court should hence vacate the Final Rule, without reinstating the old, also illegal, rule.

With little to say on the law, the agencies instead try to evade judicial review. They argue that overlapping Environmental Protection Agency ("EPA") regulations promulgated *after* Petitioners filed suit

deprive Petitioners of standing. This argument confuses standing with mootness and fails in any event. Agencies don't get to stop judicial review by the simple expedient of inflicting regulatory injuries not just once, but twice. And even after considering EPA's new rules, the agencies' modeling itself demonstrates that the Final Rule harms Petitioners in multiple different ways.

## STANDING

The agencies argue that Petitioners lack standing. But their main argument conflates standing with mootness and is wrong either way. Their remaining standing arguments also fail.

## I.    PETITIONERS HAVE ESTABLISHED STANDING

The agencies begin by asserting that unregulated parties face more difficulty establishing standing. Brief for Respondents 14–15 ("Resps.Br."). That's true as far as it goes, but it doesn't go very far here.

When a party is the subject of regulation, "standing is usually easy to establish." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). In those instances, standing is "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). In administrative law cases, however, an "unregulated plaintiff ... often will sue ... to challenge an allegedly unlaw-

ful agency rule that regulates others but also has adverse downstream effects on the plaintiff." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2460 (2024) (Kavanaugh, J., concurring); *see, e.g.*, *NRDC v. NHTSA*, 894 F.3d 95, 103–05 (2d. Cir. 2018). Standing is not always self-evident in those suits. So, an unregulated party must establish standing with "specific facts supported by affidavit or other evidence." *Iowa League of Cities v. EPA*, 711 F.3d 844, 870 (8th Cir. 2013) (internal quotation marks omitted).

A party shows standing if there's a "substantial risk" it will suffer harm through the "predictable effect of Government action on the decisions of third parties"—here, automobile manufacturers. *Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019). A party may rely on "common sense and basic economics," *NRDC*, 894 F.3d at 105 (brackets omitted), and agency findings, *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381–82 (D.C. Cir. 2020). Unregulated parties routinely prove a substantial risk, and if anything, standing is easier to satisfy here because Petitioners include States. "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S.

497, 518 (2007). They receive "special solicitude," and may suffer injuries that ordinary citizens cannot. *Id.* at 520.

Applying that standard, Petitioners met their burden. Petitioners didn't "speculate." Resps.Br.14. They submitted detailed affidavits and other evidence showing predictable harm. Opening Brief of Petitioners 25–29 ("Pets.Br."); Addendum of Petitioners 21–34 ("Pets.Add."). To dispute jurisdiction, the agencies principally rely upon EPA regulations published after Petitioners filed suit, which, at best, go to mootness, not standing. *See infra* Part II.A. But the agencies never contest that, without the new EPA regulations, the petroleum-equivalency determination will increase carbon-dioxide emissions and electric automobile sales, as compared to the proposal. The agencies never model the Final Rule in any scenario without the new EPA regulations, so they concede the point. *See* Stork Decl. ¶¶ 28, 39, Supplemental Addendum of Respondents 13–14, 20–21 ("Resps.Add."). That's enough to satisfy Petitioners' burden to show predictable effects because, as discussed next, the new EPA regulations don't affect this controversy, and the risks aren't too attenuated.

## II. EPA'S SUBSEQUENT REGULATIONS DON'T AFFECT JURISDICTION

The agencies' main jurisdictional argument is that "subsequent regulatory developments" have deprived Petitioners of standing. Resps.Br.12.

The agencies now claim that the Final Rule will have no effect. Resps.Br.12, 15–17. To support their argument, they point to greenhouse-gas regulations published by EPA after Petitioners filed suit. *Id.* at 15 (citing 89 Fed. Reg. 27,842 (Apr. 18, 2024)). They claim that EPA's new regulations are more stringent than the National Highway Traffic Safety Administration's ("NHTSA's") new fuel economy standards—also promulgated after Petitioners filed suit. Resps.Br.12, 15–17; *see* Stork Decl. ¶¶ 8, 28, Resps.Add.4, 13–14 (citing 89 Fed. Reg. 52,540 (June 24, 2024)). Because of the intervening EPA regulations, the agencies assert that NHTSA's fuel economy standards will have no incremental effect on manufacturer behavior. Resps.Br.12, 15–17. And, they argue, because the fuel economy standards will have no effect, the petroleum-equivalency determination, which governs only average fuel economy, also "will not affect emissions," *id.* at 16, "will not affect the number of electric vehicles," *id.* at 17, and "will not affect the total

amount of gasoline consumption," *id.* 20. In other words, according to the agencies, the Final Rule does nothing. The manufacturers seem to embrace that point. Brief of Respondent-Intervenor 21–23 ("Mfrs.Br.").

This argument confuses standing with mootness, and fails as a matter of law and fact.

## A. EPA's Subsequent Regulations Are Not Relevant to Standing

At the outset, the agencies get the legal framework wrong. EPA's regulations are "*subsequent* regulatory developments," as they point out. Resps.Br.12 (emphasis added). "That Freudian slip … reveals the basic flaw in the Government's argument: It is the doctrine of mootness, not standing, that addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022) (cleaned up). "The distinction matters because the Government, not petitioners, bears the burden to establish that a once-live case has become moot." *Id.*

Standing is assessed "at the time the action commences." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000). This suit began when the petition for review was filed. *McNaught v. Nolen*, 76 F.4th 764, 769 (8th Cir. 2023). Even as the suit progresses,

"the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Intervening events don't matter because "the injury required for standing need not be actualized." *Id.*

The Final Rule was published on March 29, 2024, Pets.Add.1, and the petition for review was filed on April 5, 2024. April 5, therefore, is the relevant date for assessing Petitioners' standing.

EPA's regulations came after. They were made available for public inspection on April 17, 2024, and were published in the Federal Register on April 18, 2024, both after Petitioners filed suit. 89 Fed. Reg. 27,842. When Petitioners sued, the EPA regulations were therefore not yet "duly fixed." *See GPA Midstream Ass'n v. DOT*, 67 F.4th 1188, 1195 (D.C. Cir. 2023); s*ee also NRDC*, 894 F.3d at 106. EPA's rules could not affect Petitioners' standing at least until they were available for public inspection, on April 17. *See* 44 U.S.C. § 1507; *Humane Soc'y v. USDA*, 41 F.4th 564, 570 (D.C. Cir. 2022); *see also* 42 U.S.C. § 7607(b) (requiring "notice … in the Federal Register").

Petitioners' standing must therefore be assessed based on the likely effects of the Final Rule as of April 5, 2024, before the intervening EPA

greenhouse-gas regulations were finalized. Because EPA's new regulations are irrelevant to Petitioners' standing, Petitioners properly disregarded them. Just as DOE must "not defer to possible future action by other agencies in contexts outside the fuel-economy standards regime," Resps.Br.24 n.2, this Court must not assess Petitioners' standing based on "future action by other agencies."

The agencies, in short, have "confused mootness with standing, and as a result placed the burden of proof on the wrong party." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221 (2000) (citation and internal quotation marks omitted). Petitioners' "omission" of the new EPA regulations from their modeling therefore has an "explanation," Resps.Br.16—Petitioners didn't confuse mootness with standing.

## B. EPA's Subsequent Regulations Don't Moot the Case

EPA's intervening regulations don't moot the case, both as a matter of law and fact.

EPA's regulations are being challenged by Petitioners, and many others, in a separate proceeding, as venue is exclusive in the D.C. Circuit. *See Kentucky v. EPA*, No. 24-1087 (D.C. Cir. filed Apr. 18, 2024); 42 U.S.C. § 7607(b). If Petitioners prevail in that suit, it is undisputed that

the Final Rule challenged here will have the effects predicted by Petitioners, which is "sufficient to avoid mootness under Article III." *Moore v. Harper*, 600 U.S. 1, 16 (2023). Although EPA's and DOE's regulations overlap, Petitioners' "path to complete relief runs through this Court," so the case is not moot. *Id.* at 15.

To begin, Petitioners would still have Article III standing to sue today. When a party "faces two, independent regulatory obstacles that can only be attacked in separate proceedings," the relevant injury is the one caused by the rule at hand, and "both the causation and redressability prongs are plainly satisfied." *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 194 (3d Cir. 2004) (Alito, J.). Standing is not defeated "where an effect is causally over-determined, i.e., where there are multiple sufficient causes." *Id.* at 195 (quotation marks omitted). "Article III standing," after all, "does not follow the causation principles of tort law." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023). "An injury may be 'fairly traceable' to [the agency] … even when [the agency's] actions are not 'the very last step in the chain of causation.'" *Wieland v. HHS*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)).

Overlapping fuel economy and greenhouse-gas regulations, as NHTSA artfully put it, force manufacturers to continue on the same path even "if other regulatory pushes change in unexpected ways." 88 Fed. Reg. 56,128, 56,349 (Aug. 17, 2023). The fuel economy standards—and the related Final Rule—therefore "in reality … ha[ve] a powerful coercive effect" on manufacturers, which suffices to show traceable injury. *Bennett*, 520 U.S. at 169. Any other rule would allow the executive to defeat judicial review simply by writing two illegal rules, rather than just one. "Article III does not dictate such an absurd result." *Khodara Env't, Inc.*, 376 F.3d at 195.

The agencies' contrary argument conflicts with binding precedent. Consistent with then-Judge Alito's decision in *Khodara*, this Court has held that overlapping regulations don't affect standing unless the other regulations go "unchallenged." *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024); *cf. Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 131 (8th Cir. 1997). Because the EPA regulations are not going unchallenged (including by Petitioners here), they don't affect standing or mootness as a matter of law.

This also follows from the principle that "standing in no way depends on the merits." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). When determining standing, courts assume a petitioner will prevail, not lose. *Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020). A fortiori, that must be true when venue rules commit a related merits challenge to a different circuit. Otherwise, standing would "depend on the merits" of a challenge that's not even before the Court. But in any event, if the EPA regulations are truly intertwined with this Court's jurisdiction, then this Court has jurisdiction to decide whether the EPA regulations are valid and should order supplemental briefing. *Cf. Brownback v. King*, 592 U.S. 209, 218–19 (2021) (courts have jurisdiction to decide their jurisdiction). What a court cannot do is declare a case moot by assuming an agency will win a pending case not before it.

Regardless, the case is not moot. First, the alleged mootness results from the voluntary acts of the agencies, not "some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). EPA,[1]

---

[1] Petitioners have standing to sue EPA in this case. *Contra* Resps.Br.21 n.1. EPA implements the Final Rule through its average fuel economy calculations, 49 U.S.C. § 32904(a)(2)(B), so the harm is traceable to EPA, and may be redressed by a declaratory judgment preventing EPA from implementing the Final Rule. *See infra* Part V.

DOE, and NHTSA admit they acted in concert. *See* Stork Decl. ¶ 5, Resps.Add.3; *see also* 89 Fed. Reg. at 52,562, 52,825. So, the agencies must show (1) "there is no reasonable expectation that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (cleaned up).

They don't meet this burden. Even assuming the EPA regulations are upheld, the agencies don't establish that the petroleum-equivalency determination will have no effect.

Notably, the agencies' declarant doesn't say, as their brief claims, that the petroleum-equivalency determination "will not affect the number of electric vehicles that automakers choose to produce," the amount of carbon-dioxide emissions, or "the total amount of gasoline consumption." Resps.Br.16–17, 20. What the declarant does say is that the petroleum-equivalency determination will have no "statistically significant effect" on emissions or gasoline consumption, and no "meaningful effect" on new electric automobile sales. *See* Stork Decl. ¶¶ 35, 37–38, Resps.Add.19–20. But the declarant provides no statistical analysis or criterion of statistical significance, and suspiciously reports numbers

only in oversized figures such as trillions of gallons of gasoline or billions of tons of carbon. *See* Stork Decl. ¶¶ 31–32, Resps.Add.15–17. That raises eyebrows.

When you zoom in, the declarant's modeling proves Petitioners' theories of harm. The modeling shows that compared to the proposal, the Final Rule increases carbon-dioxide emissions and electric automobile sales, and reduces liquid fuel use, even with EPA's regulations in place. *See* Myers Suppl. Decl. ¶¶ 23–26, Ex. A to Motion to File a Supplemental Declaration in Support of Article III Jurisdiction 5–8, Doc. 5429205 ("Ex.A"). Using large figures such as trillions of gallons may obscure these effects, as "nothing is great or little otherwise than by comparison." Jonathan Swift, *Gulliver's Travels* (1726). But the Final Rule's effects would remain consequential nonetheless: the agencies' modeling shows that compared to the proposed rule, the Final Rule will increase carbon-dioxide emissions by "2.29 million metric tons," "result in approximately 765,000 more electric vehicles being sold," and reduce liquid fuels by 91 million gallons. Myers Suppl. Decl. ¶¶ 23–26, Ex.A.5–8.

That is "meaningful." For example, the projected increase in carbon-dioxide emissions is equivalent to operating "545,024" gas cars for

a year or burning "2,523,755,494 pounds of coal." *Id.* ¶ 24, Ex.A.6. EPA's head of enforcement recently called a slightly smaller carbon-dioxide reduction the "most significant" in the enforcement program's history. *Id.* And regardless, what matters is that a favorable judgment could lead an agency to "take steps to slow or reduce" emissions that contribute to an injury, not the relative size. *Massachusetts*, 549 U.S. at 525 (emphasis deleted). The agencies' modeling therefore confirms all three harms asserted in Petitioners' opening brief.

NHTSA's recent modeling also confirms that the fuel economy regulations will continue to have practical effects. Although NHTSA collaborated with the declarant here, *see* Stork Decl. ¶ 26, Resps.Add.13, NHTSA tells a different story in its recent fuel economy rule. There, NHTSA ignores EPA's latest regulations to claim credit for billions of gallons in fuel savings. *See* 89 Fed. Reg. at 52,553, 52,698 n.826. Under the logic of the agencies' declarant, NHTSA's analysis is therefore "unreliable," and NHTSA is hoodwinking the public. Stork Decl. ¶ 44, Resps.Add.22.

NHTSA, however, also buried in its regulatory docket a short "side study" modeling the *combined* effect of the new EPA regulations and its

fuel economy standards. 89 Fed. Reg. at 52,825 & n.1175. Although the modeling data isn't public, NHTSA's memorandum concludes that the modeling shows, among other things, "a small increase in [electric-vehicle] technology penetration projected when combining the standards." Memo to Dkt. No. NHTSA-2023-0022, at 2 (June 7, 2024).[2] In other words, NHTSA predicts its fuel economy regulations will continue affecting manufacturer behavior even when combined with EPA's intervening rule. This "side study" contradicts the agencies' claim here that the fuel economy standards won't drive manufacturer behavior, and the manufacturers' similar claim that "NHTSA agrees" with that assertion. Mfrs.Br.22; *see* Myers Suppl. Decl. ¶¶ 28, 29, Ex.A.8.

The agencies and manufacturers also contradict themselves. Is the petroleum-equivalency determination "hugely significant," as the manufacturers' CEO recently put it, *see* John Bozzella, *Petroleum-Equivalency Factor: 101* (Mar. 19, 2024), https://perma.cc/6QND-Y2JJ, or irrelevant, as they argue now? Resps.Br.15–17, 20; Mfrs.Br.21–22. Their briefs say the fuel economy rules won't affect manufacturer behavior, but that Plaintiffs' requested relief would disrupt compliance choices, deplete

---

[2] Available at https://perma.cc/HJ7A-HQRW.

credit banks, and threaten enormous fines. Resps.Br.53; Mfrs.Br.51. These claims cannot be reconciled. As the Supreme Court has "recognized on numerous occasions," "civil penalties … deter future violations." *Laidlaw*, 528 U.S. at 185. The very point of the statutory penalties is to encourage automobiles that use less fuel. Graham Decl. ¶ 10, Pets.Add.22.

So, "by automakers' own admission, the increased penalty has the potential to affect automakers' business decisions and compliance approaches." *NRDC*, 894 F.3d at 105. Indeed, the manufacturers' intervention belies the asserted futility of the Final Rule. Manufacturers "would presumably not bother with such efforts if [they] thought [the Final Rule] would have no discernable impact." *Massachusetts*, 549 U.S. at 526.

The agencies' principal standing argument thus fails.

## III. THE STATES HAVE STANDING

The agencies raise other objections to State standing. All fail.

### A. The States Have Shown *Massachusetts* Standing

First, the agencies claim Petitioners have not established a concrete harm arising from increased greenhouse-gas emissions. Resps.Br.16–17.

This is puzzling. Petitioners raise the same sovereign harm that the Supreme Court held sufficient in *Massachusetts*, harm to coastal property, and several Petitioners, such as Florida, own coasts. Pets.Br. 25; *cf. Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 708–09 (2010) (describing Florida's sovereign land in beaches). Petitioners' declaration, cited in the brief, Pets.Br.25, explains that EPA has found that automobile carbon-dioxide emissions contribute to sea-level rise, including in Florida. Graham Decl. ¶ 28, Pets.Add.26. In support, the declarant quotes a judicially noticeable document summarizing EPA's "endangerment finding." *Id.* According to EPA, coastal areas, including Florida, experience sea-level rise as a result of automobile carbon-dioxide emissions, and EPA ominously asserts that "almost all of the city of Miami" could be at risk of flooding under certain "warming" scenarios. 89 Fed. Reg. at 27,863.

*Massachusetts* is therefore controlling. In fact, the Court in *Massachusetts* didn't have the benefit of an "endangerment finding," as Petitioners do here. Having found that carbon-dioxide emissions portend disaster to Petitioners' coasts, and having used the "endangerment finding" to unleash a regulatory typhoon on the States and their industries,

the federal agencies cannot now retreat into a posture of agnostic skepticism. *Massachusetts* suffices to establish standing here.

## B.     Other State Injuries Are Not "Too Attenuated"

The agencies also argue that other harms raised by the States are "too attenuated." Resps.Br.18.

The federal agencies rely on a footnote in *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023), Resps.Br.18, but that case doesn't apply. That case held that plaintiffs generally lack standing to seek orders requiring "the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions," with at least five potential exceptions. *Id.* at 677, 681–83. The footnote cited by the agencies says only that because of "the fundamental Article III problem with [the] lawsuit"—interfering with arrest and prosecution policies—the States' asserted harms there were too attenuated. *Id.* at 680 n.3. This case isn't about arrest policies or anything similar, so the footnote is irrelevant to this challenge.

Far more apt are the many cases holding that States have standing based on downstream injuries to State property or revenues. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2365–66 (2023); *Massachusetts*, 549

U.S. at 521–26; *Wyoming v. Oklahoma*, 502 U.S. 437, 447–48 (1992); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160–61 (1981); *Maryland v. Louisiana*, 451 U.S. 725, 736–37 (1981). The agencies ignore these cases.

Based on governing precedent, the harms here are not too attenuated, but predictable. We have already discussed *Massachusetts*. *See supra* Part III.A. Consider also the harm to state roads from the sale of heavier electric automobiles. The goal of the Final Rule is to encourage more electric automobiles, and that is a predictable effect of inflating their efficiency nearly sevenfold. Pets.Br.27. The rest follows from the laws of physics, which are predictable. Watts Decl. ¶ 11, Pets.Add.30. If the response of noncitizens to a census question was predictable enough for standing, *Dep't of Com.*, 588 U.S. at 768, then a harm based on the laws of physics, not the vagaries of human behavior, is predictable enough for standing.

The agencies don't even dispute the chain of causation: They don't dispute that electric automobiles will double road repair costs compared to the gasoline automobiles they displace. Watts Decl. ¶¶ 10–13, Pets.Add.30–31. The agencies assert only that the harmful effect of electric automobiles on roads is "negligible" compared to that of trucks.

Resps.Br.19. But for standing, an "identifiable trifle will suffice." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 988 (8th Cir. 2011); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). Petitioners have to prove the harm is real, not that it is large. They have met that burden.

The agencies also argue that Florida's roads will not be harmed because the State charges higher registration fees for heavier vehicles. But Florida's fee schedule sweeps broadly—automobiles weighing more than 3,500 pounds pay the same. Florida Highway Safety and Motor Vehicles Fees, https://perma.cc/7HVB-ALC4. Most new automobiles exceed this weight: the average weight is 4,303 pounds. The 2023 EPA Automotive Trends Report 22, https://perma.cc/9XPH-6YLB. So, heavier electric automobiles will pay the same fee as most gasoline automobiles. The registration fees also won't offset the many miles driven by heavier out-of-state automobiles. So, Florida's registration fees do little if anything to offset the increased cost of road wear from more electric automobiles.

And regardless, standing is "not an accounting exercise." *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015). A State's ability to offset

harm by levying fees on its citizens is not relevant. *Id.* "Why don't you try something else rather than suing us" is not an argument that defeats federal jurisdiction.

The agencies also argue that "electricity-procurement costs" are too attenuated. Resps.Br.18. But States have standing to challenge regulatory actions affecting retail electricity rates. *See Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185–86 (D.C. Cir. 2022). The harm is also supported by basic economics: more demand for electricity will raise the price. *See* EPA, Regulatory Impact Analysis, EPA-420-R-24-004, at 5-19 (Mar. 2023), https://perma.cc/R3F2-HMYY (predicting higher electricity rates as a result of more electric automobiles in Florida). The States therefore have standing.

## IV. AMFREE HAS STANDING

"If at least one plaintiff has standing, the suit may proceed." *Nebraska*, 143 S. Ct. at 2365. Because the States have standing, the Court need not decide whether Petitioner AmFree has standing. But regardless, it does.

AmFree's theory of harm is straightforward. The Final Rule's goal is to increase the market share of new electric automobiles, which con-

sume no liquid fuel. That would harm AmFree's members by predictably impeding sales of liquid fuel products. *Cf. Energy Future Coal. v. EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (Kavanaugh, J.). The agencies' modeling supports AmFree's standing; it shows that the Final Rule reduces sales of liquid fuels, even as it increases overall energy use. Myers Suppl. Decl. ¶¶ 25, 30–31, Ex.A.6–7, 8–9.

Petitioners agree that AmFree's members would lack standing on this basis if DOE's petroleum-equivalency determination is so artificially inflated that any liquid fuel saved by increasing sales of electric automobiles is offset by the sale of less efficient gasoline automobiles. *See* Resps.Br.20. But that would only mean that the States have *Massachusetts* standing, and that the Final Rule doesn't advance the energy conservation goals of the statute. The agencies can't have it both ways.

The agencies also curiously pretend to know AmFree's purpose better than AmFree. *Id.* at 20–21. AmFree's purpose of promoting a free market is furthered by this challenge. A "free market" cannot work well when agencies pick winners by arbitrarily multiplying the efficiency of their favored technology by nearly seven without a legal or factual basis.

# ARGUMENT

## I. THE FUEL-CONTENT FACTOR IS UNLAWFUL

DOE's fuel-content factor has no basis, and the agencies' brief underscores why.

The agencies claim that multiplying electric vehicle efficiency by nearly seven is lawful because electric automobiles are more efficient than gasoline automobiles—at least when you ignore all the upstream energy losses needed to power them. Resps.Br.22. But Congress took that advantage fully into account by directing DOE to consider "the approximate electrical energy efficiency of the vehicle." 49 U.S.C. § 32904(a)(2)(B)(i). The agencies thus admit that the fuel-content factor overstates the efficiency of electric vehicles, so that it is no longer "approximate," but "inflated" (DOE's own word). 89 Fed. Reg. 22,041 22,051 (Mar. 29, 2024), Pets.Add.11. That alone is unlawful. Pets.Br.44–45.

Next, the agencies argue that the fuel-content factor is lawful because petroleum is relatively "scarce." Resps.Br.23. "DOE projects that, by 2027, nearly half of electricity will be produced from renewable

sources like wind and solar,"[3] while petroleum is "finite" or "scarce." *Id.* Read further, though, and a few pages later, the agencies disclaim reliance on the relative scarcity of petroleum: DOE, they protest, has never justified the fuel-content factor "based on scarcity of petroleum reserves," and "rejected an approach that would have 'considered energy scarcity' as a more central component" of its analysis. *Id.* at 30–31. So, they argue, (1) the fuel-content factor is lawful because petroleum is relatively scarce, but also, (2) DOE never considered petroleum's relative scarcity, nor was scarcity "central."

"[We] give up. Now [we] realize fully what Mark Twain meant when he said, 'The more you explain it, the more I don't understand it.'" *SEC v. Chenery Corp.*, 332 U.S. 194, 214 (1947) (Jackson, J., dissenting). DOE's "internally inconsistent" rule is arbitrary and capricious. *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 23-3230, 2024 WL 3737366, at *8 (8th Cir. Aug. 9, 2024).

---

[3] That is unrealistic. "Renewables" accounted for 21.4% of all electricity generated in 2023. Energy Info. Admin., *FAQs: What is U.S. Electricity Generation by Energy Source?*, https://perma.cc/H668-QV9H (last updated Feb. 2024).

The agencies also rely on "purpose." Congress, they say, included electric automobiles in average fuel economy calculations as an incentive. Resps.Br.31. No dispute. Pets.Br.35. The disputed question is how much of an incentive, and whether DOE's discretion has meaningful legal limits. It does. Congress would not write a four-factor scheme requiring technical "equivalent" comparisons of gasoline and electricity just to allow DOE to give an incentive "at all costs." *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023).

The agencies also discuss Congress's decision to carve out electric automobiles from the fuel-content factor scheme in section 32905. Pets.Br.31–32. They argue that this "only" proves that DOE's "experts" were all the more reasonable when they ignored the congressional carve-out, and divided real-world efficiency by a ".15" fuel-content factor that Congress expressly gave only to "liquid" and "gaseous" alternative fuels. Resps.Br.28. That extravagant claim requires no sustained response. Congress extended a ".15" fuel-content factor to natural gas because it is Congress, and it may act whimsically to please favored constituencies. The very premise of the APA is that agencies cannot act whimsically, but that's what DOE did.

The agencies ultimately concede Petitioners' point: there's nothing new or "revised" about the fuel-content factor. Pets.Br.30. The agencies explain where the fuel-content factor comes from: DOE is just taking the same old fuel-content factor and using it "as a baseline." Resps.Br.32.

Precisely. DOE has "re-adopted," Resps.Br.22, the same fuel-content factor that has "no basis in 32905 or 32904." 88 Fed. Reg. 21,525, 21,530 (Apr. 11, 2023), App.13. The words "scarcity" and "S-curve" thus are "contrived reasons" that do no analytical work. *Firearms Regul. Accountability Coal.,* 2024 WL 3737366, at *12 (quoting *Dep't of Com.,* 588 U.S. at 785).

The agencies say that DOE's proposal "simply recognized that the alternative-fuel statute (49 U.S.C. § 32905) does not itself expressly authorize a fuel-content factor for electricity." Resps.Br.28. That's wrong. DOE, to repeat, said "there is no basis" for the fuel-content factor "in 32905 *or 32904.*" 88 Fed. Reg. at 21,530, App.13 (emphasis added). What DOE "simply recognized" is that the fuel-content factor is unlawful root and branch. DOE, to be sure, floated another inflated alternative based on the relative scarcity of fuel reserves, but DOE rejected that analysis as flawed, Pets.Br.46, and the agencies repudiate it here, Resps.Br.30–

31, 34 n.34. In short, the agencies admit the "re-adopted" fuel-content factor is the same as the old: and thus just as illegal.

Petitioners didn't just criticize. They also provided the Court with the best reading: DOE should use fuel prices to determine "relative scarcity and value." Pets.Br.34.

DOE asserts this "finds no basis in the statutory text." Resps.Br.26. But of course, this is not just Petitioners' reading; it is DOE's original, contemporaneous reading. Pets.Br.34–35. It is therefore entitled to "respect." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257–58 (2024). More so here, as Congress presumably "ratified" this reading when it excluded electric automobiles from section 32905 and retained the petroleum-equivalency determination instead, without change, as an adequate incentive for electric automobiles. *CFTC v. Schor*, 478 U.S. 833, 846 (1986).

The agencies argue that prices aren't perfect. They say the scarcity and value of fuels cannot be determined "through price alone," because of "subsidies" such as environmental "externalities." Resps.Br.27. But "environmental responsibilities" are EPA's job under the Clean Air Act, and are "wholly independent" from the Motor Vehicle Act's "mandate to

promote energy efficiency." *Massachusetts*, 549 U.S. at 532. As for real subsidies, such as tax credits, Petitioners agree: commercial solar panels and wind turbines, like electric automobiles, exist only because of subsidies. Petitioners are thus open to excluding heavily subsidized solar and wind from price comparisons.

Really, Petitioners are open to any reasonable, evidence-based comparison of the scarcity and value of fuels. Petitioners just can't think of any reasonable way to compare the relative scarcity and value of fuels without prices, and DOE has struggled to figure out a different approach since the mid-1990s without success. Mfrs.Br.10–12. Although prices aren't perfect, comparing prices is the only sensible way to operationalize the text, and the "best reading all the same." *Loper Bright*, 144 S. Ct. at 2266.

The agencies confirm Petitioners' reading. They argue that DOE must account for "energy security and the nation's exposure to fuel-price shocks in global markets." Resps.Br.27, 29–30. But preventing "*price shocks*" supports, rather than undermines, looking at prices: Electric automobiles won't help prevent "price shocks" if electricity fuel prices are

much higher than gasoline prices. DOE understood the point in 1980, but has forgotten it now.

The manufacturers, for their part, argue that Petitioners ignore "the need of the United States to conserve all forms of energy." Mfrs.Br.31–33. That accusation is surprising. Petitioners recognize that conserving energy is the goal of the statute, Pets.Br.37, but argue that the fuel-content factor undermines this purpose, *id.*, and that there is no need to conserve energy because U.S. petroleum reserves are abundant. Pets.Br.39–44. That is not "blue-penciling" the need to conserve all forms of energy. Mfrs.Br.33.

The manufacturers also ask this Court to adopt a judge-made issue-exhaustion rule. They argue that no one raised an identical interpretation of the law during the rulemaking. Mfrs.Br.33. But if nobody urged this reading, it's because when DOE took comment, it agreed that "there is no basis in 32905 or 32904" for the fuel-content factor and proposed a repeal. 88 Fed. Reg. at 21,530, App.13. The manufacturers' issue-exhaustion rule is an invitation to agency sandbagging, not "simple fairness." Mfrs.Br.33.

It is also wrong. As a general matter, "[c]ourts are not free to impose an exhaustion requirement as a rule of judicial administration." *Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (remedy exhaustion). And a rulemaking is not adversarial, so waiver doctrines don't apply. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019). Nor does issue exhaustion apply to issues "regarding the agency's statutory authority." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019). Courts must always adopt the "best reading" of the statute, no matter what an agency says in the record below. *Loper Bright*, 144 S. Ct. at 2266.

But even if issue exhaustion applied, the issue was exhausted: commenters argued that the fuel-content factor was illegal, App.27, 64, 73, so DOE was on notice of this "objection"—indeed, DOE itself made the objection. *Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024) (interpreting issue-exhaustion provision). As the Supreme Court just held, courts may not adopt "a hair-splitting approach" by requiring commenters to make "the identical argument made before the agency." *Id.* The manufacturers' hair-splitting exhaustion standard therefore has no basis in law or doctrine.

The manufacturers also argue that, in a counterfactual world, DOE would need to consider reliance interests in unlawful subsidies. Mfrs.Br.38. The manufacturers are, of course, free to complain about their reliance interests on remand. But the Court cannot consider them now because DOE didn't use reliance interests to justify the action it took. Considering them now would flout the "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015).

The manufacturers are wrong in any event to argue that DOE could exceed its authority because of the manufacturers' reliance. Mfrs.Br. 39 (citing *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20–34 (2020)). *Regents* doesn't hold that reliance interests trump law. *Contra* Mfrs.Br.39. In *Regents*, the Supreme Court didn't reach the legality of the controversial aspects of the Deferred Action for Childhood Arrivals policy—the grant of social security benefits and work authorization— "[b]ecause of [purported] gaps in respondents' briefing." *Regents*, 591 U.S. at 25. The Court noted that the government hadn't addressed the legality of continuing "the forbearance policy at the heart of" the program, and so

forbearance remained "within the discretion" of the agency. *Id.* at 28. And the Court then held the agency gave "no reason for terminating forbearance." *Id.* Unlike in *Regents*, there are no gaps in briefing here: Petitioners argue that the fuel-content factor—all of it—is illegal. Illegal policies are not "within the discretion" of DOE. 5 U.S.C. § 706(2)(A), (C).

Also unpersuasive is the manufacturers' suggestion that the fuel-content factor "is actually low"—a 666% boost is not enough. Mfrs.Br.36. The manufacturers now argue that DOE should consider only the "de minimis" sliver of petroleum used in the electricity sector and ignore all the other forms of energy needed to power electric automobiles. *Id.* That has no basis in a law requiring DOE to consider "the national average electrical generation and transmission efficiencies," and "the need of the United States to conserve *all* forms of energy and the relative scarcity and value to the United States of *all* fuel used to generate electricity." 49 U.S.C. § 32904(a)(2)(B)(ii), (iii) (emphases added). When Congress asked DOE to conserve "all forms of energy," it didn't authorize DOE to ignore all forms of energy except petroleum. That would be "blue-penciling" the statute. Mfrs.Br.33.

## II. DOE's Cumulative Gasoline-Equivalency Methodology Is Unlawful

As Petitioners have argued, the Final Rule abruptly departs from DOE's proposed and longstanding approach for calculating the efficiency of the electric grid, and shifts to an entirely new methodology that calculates the cumulative efficiency of the grid over the lifetime of a vehicle. The new method projects the efficiency of the grid over the putative 40-year lifetime of electric automobiles based on erroneous projections about the composition of the electric-automobile fleet.

***DOE failed to give notice.*** This new methodology was never subject to notice-and-comment. Pets.Br.47–52. DOE could have easily issued a supplemental notice of proposed rulemaking explaining this new methodology and subjected its data to comment, but instead it cut corners and violated basic principles of administrative law. Pets.Br.52.

The agencies say they "expressly asked for comments" on the "particular issue" of a "forward-looking approach." Resps.Br.42. But DOE never suggested, or hinted, that it was considering a new methodology that would project the cumulative efficiency of the grid over the lifetime of a vehicle. What DOE proposed and requested comment on was projecting the electricity grid for "model years 2027 through 2031"—the years

the vehicles will be manufactured—rather than rely on the efficiency of the grid in calendar year 2023, when DOE proposed the regulation. 88 Fed. Reg. at 21,531, App.14.

Those are very different issues. Unlike the methodology DOE settled on, the proposed methodology doesn't require projecting the future composition of the electric-automobile fleet mix from 2027 through 2031, speculating about the survivability of those electric automobiles without data, or relying on crystal ball projections of the grid up to at least 2070. Pets.Br.50. Because DOE skirted the process, this Court must at least remand for notice and comment.

***DOE violated the law.*** There's no need to remand for that purpose, however, if the Court agrees that DOE must consider the efficiency of the electricity grid when the automobile is manufactured, not over the automobile's entire lifetime. Pets.Br.52–54. Summoning the spirit of *Chevron*, the agencies claim the statute is ambiguous: The statute, they say, "does not necessarily refer only to efficiencies in the year in which the *vehicle* is produced; it just as readily refers to 'the' efficiencies in the years in which the *electricity* used by the vehicles is produced." Resps.Br.36. But that doesn't help: the Court must "determine the best

reading of the statute and resolve the ambiguity," not defer to the agency. *Loper Bright*, 144 S. Ct. at 2266. And here, context resolves any ambiguity in Petitioners' favor.

Electric automobiles are included in the "calculation of average fuel economy" for the model year when the "manufacturer manufactures an electric vehicle." 49 U.S.C. § 32904(a)(2)(B). The "values determined" by DOE for those manufactured automobiles must be reviewed "each year." *Id.* And the efficiency value must be based on "*the* national average electrical generation and transmission efficiencies." *Id.* § 32904(a)(2)(B)(ii) (emphasis added).

In that context, the best reading is that "the national average" refers to the efficiency of the grid during the model or calendar year when an electric automobile is included in an average fuel economy calculation, and not, as the agencies contend, to the efficiencies of the grid during "the years"—plural—in which the electricity used by the vehicle is produced by utilities. Resps.Br.36. The statute's object is the automobile manufacturer, which makes a vehicle and complies with fuel economy standards in a particular year, not the electric utility. Indeed, that's how DOE has always understood the statute—until the Final Rule. *See, e.g.*, 46 Fed.

Reg. 22,747 (Apr. 21, 1981). DOE's original, longstanding view is entitled to "respect." *Loper Bright*, 144 S. Ct. at 2258. Its belated switch is not. *Cf. id.* at 2262.

The manufacturers again raise issue exhaustion. Mfrs.Br.43. Again, it fails. The manufacturers argue that nobody objected to DOE's "use of any multi-year forecasts" to calculate the efficiency of the grid. Mfrs.Br.43. But AmFree laid out this precise statutory interpretation and argument in its comment and objected that "current facts about generation should be the basis of the calculation, not speculation about what might happen," App.94, satisfying even the manufacturers' hair-splitting standard of issue exhaustion.

**DOE acted arbitrarily.** If the Court agrees with Petitioners' statutory argument, then there's no need to keep going. But if not, then DOE's approach was arbitrary.

DOE's projection is premised on the assumption that the composition of the electric- and gasoline-automobile fleets will be the same. The agencies argue that it was reasonable to assume that the fleets will be the same because no "data about future conditions … exists." Resps.Br.39. But as Petitioners pointed out, data for the current model

year fleet does exist, and it shows that the fleet of electric automobiles is very different from the gasoline fleet—electric automobiles, as one would expect, are more often passenger cars (e.g., commuter sedans). Pets.Br.56. And passenger cars—according to DOE's own scrappage data—are far more likely to be scrapped early than sport-utility vehicles and pickups. *Id*. Existing data therefore shows that the fleets are not, and never have been, similar.

DOE gave no reason to expect that manufacturers will shift product lines by model year 2027, and it's too late to give reasons now. And trends don't necessarily support DOE's approach. Manufacturers are increasingly betting on hybrids to increase the fuel economy of heavier sport-utility vehicles and pickups, because consumers buy them and they don't require expensive, batteries. *See, e.g.*, Mike Colias, *Ford Shrinks Its EV Rollout Plans as Demand Lags*, Wall St. J. (Aug. 21, 2024).

Treating unlike things the same is arbitrary. *GPA Midstream Ass'n*, 67 F.4th at 1199. That's what DOE did here.

## III. DOE's Failure to Account for Differences in Patterns of Use Is Unlawful

For four decades, DOE has ignored its statutory duty to "compare[]" "the specific patterns of use of electric vehicles … to petroleum-fueled

vehicles." 49 U.S.C. § 32904(a)(2)(B)(iv). The agencies ask this Court to rubberstamp DOE's continued dereliction, claiming that DOE "consider[ed] relevant evidence" and "exercise[d] technical judgment" when it concluded that electric automobiles are driven the same number of miles. Resps.Br.45.

But in its proposal, DOE cited no evidence. Pets.Br.59. It asserted that electric automobiles "are equivalently capable" and pointed to a "Biden-Harris Administration" press release promising to use taxpayer money to build more public chargers. 88 Fed. Reg. at 21,530 & n.39, App.13.

Commenters explained that DOE's assertion is untrue. Pets.Br.59. Indeed, if electric automobiles "are equivalently capable," then why should Congress give them tax credits for Americans to buy them? Why should states ban gasoline automobiles that compete with them? *See, e.g.*, Cal. Code Regs. tit. 13, § 1962.4. Why are electric automobiles accumulating dust in dealer lots, even as manufacturers cut prices and lose tens of thousands of dollars to make them? Greg S. Fink, *Ford Lost $130,000 on Every EV It Sold in the First Quarter*, Car & Driver (Apr. 26, 2024), https://tinyurl.com/3zd6x22f. And why, on top of all the subsidies and

bans, does DOE then need to inflate their efficiency by 666% just to provide manufacturers with an adequate "incentive" to produce them?

The answer is that Congress, manufacturers, DOE, and drivers all know that electric automobiles are not "equivalently capable." Electric automobiles have a far lower and inconsistent range, inconvenient charging times, and low resale values, among several other downsides. Some drivers like them, but most do not.

As for the "Biden-Harris Administration" press release, "only seven or eight charging stations have been produced with the $7.5 billion investment that taxpayers made back in 2021." *Transcript: Transportation Secretary Pete Buttigieg on "Face the Nation,"* CBS News (May 26, 2024), https://perma.cc/K88P-ZXAD. Press releases are easy. Building chargers is not.

In the Final Rule, DOE did cite some supporting evidence. Two papers—including a U.C. Davis paper commissioned to support California's ban on gasoline automobiles. Resps.Br.46. But as Petitioners explained, those studies rely on a biased and unrepresentative sample of households that own both a gasoline and an electric automobile. Pets.Br.61–62. As Petitioners noted, this tells you almost nothing about

how often the vast number of households who only own gasoline automobiles drive their cars. Pets.Br.61–62. Households that own two or more cars drive the second car far less often. DOE, *Fact of the Week #1332* (Mar. 4, 2024), https://perma.cc/4KKN-69C7. Given California's high gasoline prices, a two-vehicle household is likely to use the electric automobile as a primary vehicle for daily city commutes, and to use the gasoline automobile occasionally as a long-range option for long-distance weekend trips, accumulating fewer miles.

By contrast, every study that uses a representative national sample of drivers, including single-vehicle households that own a gasoline automobile, contradicts the two unrepresentative studies DOE relied upon in the Final Rule: they show that electric automobiles are driven far less often. Pets.Br.62–64.

The agencies pretend not to understand why the two studies are "unrepresentative," Resps.Br.46, and assert that "petitioners' preferred study suffers from its own defects." Resps.Br.47. But as Petitioners explained, the U.C. Davis study acknowledges the sample isn't representative. Pets.Br.61.

Petitioners also didn't have one "preferred study." Petitioners cited six studies, all of which contradict DOE's assertion that electric automobiles are driven the same number of miles. Pets.Br.62–64. The agencies don't identify any alleged "defects" in five of these six studies, nor do they explain why DOE's data is better. This is therefore not a case where, "[f]aced with imperfect data," the agency made a reasonable choice. Resps.Br.47. Instead, it is a case where DOE cherrypicked two unrepresentative studies contradicted by every study that uses a representative sample. DOE's decision arbitrarily departs from the evidence. Pets.Br.64.

DOE's decision to wait until the Final Rule to cite supporting data—however flawed—was also improper. *See* Pets.Br.59–60. In response, the agencies argue that agencies may withhold the data justifying a proposal until the Final Rule. Resps.Br.48. That would be a revolution in administrative law: "It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).

There is no "tension" between *Vermont Yankee* and this require-ment. *Contra* Resps.Br.48. *Vermont Yankee* holds that courts may not impose procedures not required by law—in that case, a live, trial-type licensing hearing with an opportunity for cross-examination. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 541–42 (1978). But requiring agencies to give "notice" of the basis of their proposal doesn't impose any additional procedure, *see* 5 U.S.C. § 553(b); it just requires real notice so that commenters have a real "opportunity to participate in the rule making through submission of written data, views, or argu-ments." *Id.* § 553(c).

## IV. DOE'S EXPLANATION FOR THE TWO-CYCLE TEST PROCEDURE IS ARBITRARY

The agencies argue that DOE reasonably kept the two-cycle test procedure because doing so furthers the statutory "goal" of maintaining "equivalent" fuel economy. Resps.Br.50 (emphasis deleted). That's ironic, because a few pages earlier, the agencies insist that the word "equiva-lent" in the statute doesn't do any real work: it just means that the fuel economy of electric automobiles must be "expressed in similar terms (i.e., miles per gallon)." *Id.* at 26. Which is it? Is "equivalence" a "goal" of the statute, or just a labeling obligation?

The agencies assert that the study showing that the two-cycle test procedure is biased in favor of electric automobiles "concerned other matters (advertised versus actual fuel economy), not whether the two-cycle test is more accurate for electric or gasoline-powered vehicles." *Id.* at 51. That is error. The study concludes that the two-cycle test procedure, and particularly the highway test cycle, is so biased in favor of electric automobiles that a downward adjustment of 0.7, or -30%, isn't enough, and instead recommends a "0.6," or -40%, downward adjustment, larger than the adjustment for gasoline automobiles. *See* Gregory Pannone & Dave VanderWerp, *Comparison of On-Road Highway Fuel Economy and All-Electric Range to Label Values: Are the Current Label Procedures Appropriate for Electric Vehicles?*, SAE Tech. Paper 2023-01-0349, at 7 (2023); Pet.Br.66. DOE's explanation therefore doesn't make sense: a test procedure that is biased in favor of electric automobiles doesn't level the playing field.[4]

---

[4] In their opening brief, Petitioners also argued that DOE's Final Rule failed to account for charging losses. Pets.Br.57. That was error. Resps.Br.43. Petitioners thus waive this issue.

## V.  VACATUR IS THE PROPER REMEDY

The agencies argue that the Court should not vacate the Final Rule because that "would simply reinstate the prior petroleum-equivalency factor promulgated in 2000." Resps.Br.52. Of course, reinstatement wouldn't remedy Petitioners' injuries and wouldn't make sense.

That's not, however, how vacatur works. Courts need not pick between reinstating one illegal rule or keeping another one. A court may decide that "the better course is … to vacate the new rule without reinstating the old rule." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 545 (D.C. Cir. 1983). That's what the Court could and should do here. *Cf. Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 297 (8th Cir. 1985) (observing that prior regulations are usually reinstated "[u]nless special circumstances are present").

A Court may also vacate a regulation "only in part." *NRDC v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020). The Court could do that here. The Final Rule does three things. First, it repeals the 2000 rule. 89 Fed. Reg. at 22,059, Pets.Add.19. Then, it "re-adopt[s]," Resps.Br.22, the same petroleum-equivalency determination for "MY 2024, MY 2025, and MY 2026 electric vehicles." 89 Fed. Reg. at 22,059, Pets.Add.19. Last, the

Final Rule slowly phases down the fuel-content factor for later model years. *Id.*

Petitioners don't seek vacatur of DOE's repeal of the unlawful 2000 regulation. So the Court could keep that "part," while vacating the rest of the regulation.

Alternatively, the Court could enter a declaratory judgment prohibiting EPA from enforcing the petroleum-equivalency determination until DOE amends it. Vacatur isn't the only remedy. 5 U.S.C. § 703. Equity offers plenty of options; reinstatement of a prior and similarly unlawful rule is not one of them.

The Court should not simply remand without vacatur. The legal violations here are grave, and "experience suggests that [remand without vacatur] … invites agency indifference." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring); *see also Am. Pub. Gas Ass'n v. DOE*, 22 F.4th 1018, 1030 (D.C. Cir. 2022) ("Both common sense and the empirical literature confirm" that "[a]n open-ended remand without vacatur" may leave an agency with "little or no incentive to fix the deficient rule"). DOE must review and revise the petroleum-equivalency determination "each year," but it failed to do so for 23 years.

49 U.S.C. § 32904(a)(2)(B). A remand is thus not likely to inspire fast error correction.

The agencies and the manufacturers raise a timeliness objection. They argue that any challenge to the model year 2024, 2025, and 2026 petroleum-equivalency determination is too late: Petitioners should have brought their challenge in the year 2000, apparently. Mfrs.Br.49–50; Resps.Br.55 (citing 49 U.S.C. § 32909). That doesn't make sense. The Final Rule repeals the 2000 rule, and, as the agencies explain, "re-adopt[s]" (the agencies' own word, Resps.Br.22) the same determination for MY "2024, MY 2025, and MY 2026 electric vehicles." 89 Fed. Reg. at 22,059, Pets.Add.19. By repealing the old rule, re-examining it, and re-adopting the same determination beginning in 2024, DOE has "restart[ed] the statutory period for seeking review." *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 332 (D.C. Cir. 1993). DOE may not avoid judicial review simply by perpetuating its illegal ways.

The manufacturers and the agencies also argue that vacating the rule for these earlier model years would be "needlessly disruptive" and lead to "massive noncompliance." Resps.Br.53; Mfrs.Br.50. But they also claim that the Final Rule does nothing. Resps.Br.12, 15–17. Mfrs.Br.21–

23. So, it takes some chutzpah for them to then turn around and throw themselves at the mercy of the Court, arguing that the consequences will be drastic. NHTSA, moreover, cannot consider electric automobiles when setting standards. 49 U.S.C. § 32902(h); Pets.Br.4–5. Electric automobiles are "an optional compliance flexibility for manufacturers." Pets.Br.5. If vacating and remanding the Final Rule beginning in model year 2024 would cause "massive noncompliance," that's only because either NHTSA has ignored statutory limits, DOE has set an inflated petroleum-equivalency factor, or both. The proper response to these legal violations is not to remand so the agencies may continue ignoring the law, but to vacate all of the illegal steps.[5]

## CONCLUSION

For the foregoing reasons, Petitioners request that the Court grant their petition for review and vacate the new rule, without reinstating the old rule.

---

[5] Several Petitioners are challenging NHTSA's model year 2024 through 2026 fuel economy standards because NHTSA considered electric automobiles. *See NRDC v. NHTSA*, No. 22-1080 (D.C. Cir.). If the D.C. Circuit vacates the standards, the manufacturers won't have to worry about "massive noncompliance."

Respectfully submitted,

*/s/ Michael Buschbacher*
MICHAEL BUSCHBACHER
    *Counsel of Record*
R. TRENT MCCOTTER
JAMES R. CONDE
LAURA B. RUPPALT
BOYDEN GRAY PLLC
801 17th Street NW, #350
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for the American Free
Enterprise Chamber of
Commerce*

TIM GRIFFIN
Arkansas Attorney General

*/s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni
   @ArkansasAG.gov

*Counsel for State of Arkansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
ERIC H. WESSAN
*Solicitor General*
PATRICK VALENCIA
*Deputy Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

ASHLEY MOODY
Florida Attorney General

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
*Solicitor General*
Florida Attorney General's Office
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker
   @myfloridalegal.com

*Counsel for State of Florida*

RAÚL R. LABRADOR
Idaho Attorney General

*/s/ Joshua N. Turner*
JOSHUA N. TURNER
*Chief of Constitutional
Litigation and Policy*
ALAN M. HURST
*Solicitor General*
Office of the Idaho
Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for State of Idaho*

KRIS W. KOBACH
Kansas Attorney General

*/s/ Dwight Carswell*
DWIGHT CARSWELL #25111
*Deputy Solicitor General*
Office of the Attorney
General
120 S.W. 10th Avenue
Topeka, Kansas 66612
Dwight.Carswell@ag.ks.gov

*Counsel for State of Kansas*

LYNN FITCH
Mississippi Attorney General

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
*Deputy Solicitor General*
Mississippi Attorney General's
Office
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Missouri Attorney General

*/s/ Joshua M. Divine*
JOSHUA M. DIVINE, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High Street
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

/s/ Christian B. Corrigan
CHRISTIAN B. CORRIGAN
*Solicitor General*
PETER M. TORSTENSEN, JR.
*Deputy Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for State of Montana*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ Grant D. Strobl
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Attorney General
of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.Strobl@nebraska.gov

*Counsel for State of Nebraska*

DAVE YOST
Ohio Attorney General

/s/ T. Elliot Gaiser
T. ELLIOT GAISER
*Solicitor General*
MATHURA J. SRIDHARAN
*Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
GARRY M. GASKINS, II
*Solicitor General*
JENNIFER L. LEWIS
*Deputy Attorney General*
Office of the Attorney General of
Oklahoma
313 NE Twenty-first Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

KEN PAXTON
Texas Attorney General

BRENT WEBSTER
*First Assistant Attorney General*
RALPH MOLINA
*Deputy First Assistant Attorney General*
JAMES LLOYD
*Deputy Attorney General for Civil Litigation*
KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection Division*

/s/ *Wesley S. Williams*
WESLEY S. WILLIAMS
*Assistant Attorney General*
Texas Bar No. 24108009
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012
Fax: (512) 320-0911
Wesley.Williams@oag.texas.gov

*Counsel for State of Texas*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) this brief complies with the 9,000 word type-volume limitation allowed by Court Order, Doc. 5424701, because the brief contains 8,960 words, excluding the parts exempted by Rule 32(f).

This brief complies with typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

This brief has been scanned for viruses and is virus free. 8th Cir. R. 28A(h).

August 29, 2024

*/s/ Michael Buschbacher*
Michael Buschbacher

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties here are represented by counsel consenting to electronic service.

/s/ *Michael Buschbacher*

August 29, 2024                    Michael Buschbacher